RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0246P (6th Cir.)
File Name: 03a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAVID A. GOLDMEIER and
TERRY C. GOLDMEIER,
    *Plaintiffs-Appellants,*

    *v.*

ALLSTATE INSURANCE
COMPANY,
    *Defendant-Appellee.*

No. 01-3888

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-01091—Norah McCann King, Magistrate Judge.

Argued: March 25, 2003

Decided and Filed: July 24, 2003

Before: BOGGS and SILER, Circuit Judges; and STEEH,
District Judge.*

_____

* The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Tony C. Merry, PALMER, VOLKEMA & THOMAS, Columbus, Ohio, for Appellants. Jon L. Fleischaker, DINSMORE & SHOHL, Louisville, Kentucky, for Appellee. **ON BRIEF:** Tony C. Merry, PALMER, VOLKEMA & THOMAS, Columbus, Ohio, for Appellants. Jon L. Fleischaker, DINSMORE & SHOHL, Louisville, Kentucky, Jerome C. Tinianow, Columbus, Ohio, for Appellee.

———————————

## OPINION

———————————

BOGGS, Circuit Judge. Plaintiffs Terry C. and David A. Goldmeier (the "Goldmeiers") appeal the district court's grant of summary judgment to defendant Allstate Insurance Company ("Allstate"), their former employer, in their action for religious discrimination, in violation of both federal and Ohio state law. The Goldmeiers, husband and wife, are Sabbath-observant Orthodox Jews. They had resigned their positions as insurance agents with Allstate after the company announced plans to require offices to remain open on Friday evenings and Saturday mornings. Because they had not suffered discipline or discharge over this conflict, but instead resigned prior to the effectiveness of the new policy, the United States District Court for the Southern District of Ohio dismissed their complaints for failure to make a prima facie case. We affirm.

## I

The Goldmeiers began working as Allstate insurance agents in the late eighties. They ran an Allstate office first in Bexley, Ohio, and later in Lewis Center, Ohio. While the

Goldmeiers had a great deal of discretion in how they ran their own offices, including allocation of administrative expenditures, it is undisputed that they were not independent contractors, but employees of Allstate. The Goldmeiers are also Sabbath-observant Orthodox Jews and as such followed a religious prohibition against working from sundown Friday until sundown Saturday. Until 1998, they accommodated their religious and work requirements by closing their office earlier on Fridays in the winter months when the sun set before regular closing hours and always keeping it closed on Saturdays and Jewish holidays. In September 1998, Allstate announced new Service Availability Standards ("SAS"). The SAS required that, beginning on January 1, 1999, all offices had to remain open until 6 PM on Fridays and, beginning on July 1, 1999, from 9 AM to 1 PM on Saturdays. While an open office did not explicitly require the Goldmeiers' presence, it did require the presence of a licensed insurance agent at all times and the Goldmeiers were the only such agents in their office. Allstate employees were advised that failure to comply with the new policy could lead to discipline, up to and including discharge.

In response, the Goldmeiers informed Allstate that the new policy conflicted with the demands of their religion and initiated discussions in order to find an accommodation. Initially, Allstate indicated that there would be no exceptions to the office hours policy. Allstate suggested that the Goldmeiers could hire a licensed insurance agent to cover the hours they would not be present. Such part-time help had to be provided by an Allstate-approved list of "vendors," but could be funded out of the office expense allowance that the company allocated to each office. When the Goldmeiers' children were young, they had used these funds to hire outside office assistance. Nevertheless, at this time outside help was not acceptable to the Goldmeiers for multiple reasons. They contended that the office expense allowance would be insufficient to pay for an additional agent and that they would be required to cover any deficit in the allowance out of their personal funds, as they had been required to do in previous

years. Moreover, the Goldmeiers would have been responsible for the performance of the office even in their absence and they "did not want to trust [their] financial security to a vendor possibly finding someone to work while [they] weren't there." Hence the Goldmeiers did not investigate this option further.

On November 16, 1998, the Goldmeiers informed Allstate that they considered themselves to be constructively discharged and resigned their positions. As the Goldmeiers conceded at oral argument, this resignation came as a surprise to Allstate. In response, Allstate now offered to allow the Goldmeiers to observe the Sabbath but to work on Sundays instead, an offer the Goldmeiers had earlier made, but which had then been rejected by Allstate. The Goldmeiers now rejected this compromise because Allstate did not make the offer in writing and the Goldmeiers had, even before tendering their resignations, accepted new positions with another employer. On January 1, 1999, the new Allstate policy went into effect. The first Friday after the SAS went into effect that also was a regular working day was January 8, 1999, fifty-three days after the Goldmeiers resigned.

On October 20, 1999, the Goldmeiers filed a complaint against Allstate in federal district court. They alleged employment discrimination on religious grounds, in violation of 42 U.S.C. § 2000e, a parallel state law claim, under Ohio Rev. Code § 4112, and discharge contrary to the public policy embodied in § 4112. On July 13, 2001, the district court granted summary judgment to Allstate on the grounds that the Goldmeiers had not suffered an adverse employment action and therefore failed to make out a prima facie case of religious discrimination. The district court also denied the state law claim of discharge contrary to public policy because it concluded the Goldmeiers had not been discharged. Before this court now is the Goldmeiers' timely appeal of the grant of summary judgment.

## II

"Title VII makes it unlawful for an employer to 'discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's religion.'" *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) (quoting 42 U.S.C. § 2000e-2(a)(1), internal alterations omitted); *accord Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002).

The employee bears the burden of establishing a prima facie case, and sustains that burden by showing that he holds a sincere religious belief that conflicts with an employment requirement; that he has informed his employer of the conflict; and that he was discharged or disciplined for failing to comply with the conflicting requirement.

*Cooper*, 15 F.3d at 1378 (citing *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)); *accord Virts*, 285 F.3d at 516. Religious discrimination can arise out of an employer's failure to "accommodate those employees who refuse to work on particular days of the week because of their religious beliefs." *Pyro Mining Co.*, 827 F.2d at 1085.

In the present case, the parties agree that the Goldmeiers sincerely hold a religious belief barring them from work on the Sabbath and that they had informed their employer of that belief. Therefore the existence of a prima facie case depends on two disputed propositions, whether that religious belief conflicted with the SAS and whether they were discharged or disciplined for failing to comply with the SAS.

Allstate contends that the SAS did not conflict with the Goldmeiers' religious beliefs because it did not directly require them to work on the Sabbath. The SAS merely required that the office would remain open during Sabbath hours, but did not prevent them from hiring substitute agents

out of their office expense allowance, allowing the Goldmeiers to comply with both the SAS and their religious requirement. In this regard the factual situation differs from the more common religious discrimination case in which the employer explicitly requires an employee to work during the Sabbath. The employment requirement here only placed an additional burden on the religious observance, the expenditure of the limited office expense allowance or the Goldmeiers' personal funds.

Nevertheless, where the conflict between an employee's religious belief and an employer's requirement can only be removed by the employee's forfeiture or expenditure of a substantial benefit available to other employees, we hold that conflict sufficient to establish a prima facie religious discrimination case exists.[1] In *Cooper*, we ruled on a similar argument with respect to vacation time:

We recognize that use of vacation time legitimately may be required to allow an employee to avoid work on religious holidays or, in combination with other methods, to allow an employee to regularly avoid working on the Sabbath. Under appropriate circumstances, this use of a portion of an employee's vacation entitlement may be reasonable. In this case, however, Cooper was faced with the choice of working on the Sabbath or potentially using all of her accrued vacation to avoid doing so. *Getz v. Pennsylvania*, 802 F.2d 72 (3d Cir. 1986); *United States v. City of Albuquerque*, 545 F.2d 110, 113-14 (10th Cir. 1976). An employer who permits an employee to avoid mandatory Sabbath work only by using accrued vacation does not "reasonably accommodate" the employee's religious beliefs. Such an employee stands

---

[1]This is not to say that every such conflict results in a valid religious discrimination claim. Many conflicts of this type will still fail to give rise to such a claim under the reasonable accommodation part of the test. However, the search for reasonable accommodation is not part of the prima facie case.

to lose a benefit, vacation time, enjoyed by all other employees who do not share the same religious conflict, and is thus discriminated against with respect to a privilege of employment.

*Cooper*, 15 F.3d at 1379 (internal citation form normalized).[2] By the same token, the Goldmeiers were faced with a choice of violating the Sabbath or hiring outside staff using either their own funds or their limited office expense allowance, otherwise available for other business-enhancing purposes to other agents.[3] Such an incompatibility between an employment and a religious requirement is sufficient to create a conflict.

We have consistently held that a prima facie case of religious discrimination requires discharge or discipline for failure to comply with an employment requirement conflicting with a religious requirement. *See, e.g., Cooper*, 15 F.3d at 1378; *Pyro Mining Co.*, 827 F.2d at 1085; *Virts*, 285 F.3d at 516-17. In the present case it is undisputed that the Goldmeiers were not actually discharged or disciplined. To remedy this defect fatal to their case, the Goldmeiers offer two alternative theories: that they were constructively discharged and that the 1991 Civil Rights Act amendments *sub silentio* eliminated the discharge requirement.

---

[2]This discussion in *Cooper* occurs within the context of the reasonable accommodation analysis. But that circumstance only strengthens our conclusion. If requiring an employee to use up all of her vacation time to avoid working on the Sabbath is not a reasonable accommodation of a religious conflict, it *a fortiori* is not a resolution that eliminates the very existence of a religious conflict.

[3]The parties extensively dispute the cost and availability of such support staff and whether the office expense allowance could have been expected to completely cover it. However, there appears to be no dispute that the expense would have been greater than the allowance or would have at least consumed a substantial fraction of the allowance. As the Goldmeiers would have been substantively adversely affected by this expenditure in either case, we need not resolve this factual dispute.

The Goldmeiers maintain that they were constructively discharged. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *see also Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001). In the case of constructive discharge, "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). "In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). Such circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993); *accord Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998); *Hafford*, 183 F.3d at 512. The circumstances are examined from the point of view of a reasonable member of the protected class. *See Yates v. Avco Corp.*, 819 F.2d 630, 636-37 & n.2 (6th Cir. 1987) (evaluating whether sexual harassment constitutes constructive discharge from the point of view of a reasonable member of the gender being harassed).

Under these standards, Allstate did not expose the Goldmeiers to a work environment so hostile and abusive as to compel a reasonable Orthodox Jewish couple to quit, rather than tolerate it for one more day. The Goldmeiers' physical work environment was their own office, selected, staffed, and controlled exclusively by themselves and hence could hardly have been intolerable to them. Their broader corporate

environment consisted of regular contacts with Allstate management. Prior to the announcement of the new SAS in 1998, the Goldmeiers cite a few instances of religious incompatibility with Allstate. David Goldmeier forfeited two pleasure trips, one to Las Vegas and one to the Bahamas, that Allstate had awarded him in recognition of his services because they had been scheduled on the Sabbath and Rosh Hashanah, respectively. The Goldmeiers also were unable to participate in a previous, voluntary, Premier Service Agency program, because it too had required their office to be open on Saturdays. The Goldmeiers do not allege that any Allstate representative ever made any discriminatory, hostile, offensive, humiliating, or physically threatening comment towards them. The Goldmeiers do not even allege that any comment, however innocuous, with respect to their religion was ever made by an Allstate representative. Moreover, until the Goldmeiers' abrupt resignation, no action undertaken by Allstate seems to have substantively interfered with the Goldmeiers' effective performance of their work. To the contrary, the Goldmeiers express how much they enjoyed their work at Allstate for more than a decade.

Finally, in 1998, there was the announcement of the Service Availability Standards. Allstate intransigently refused to adjust the new office hours to be more congenial to the Goldmeiers. This intransigence, if it had not been tempered, as in fact it was, could potentially have led to an actual discharge at some point in the future. The Goldmeiers cite *Cooper* for the proposition that the mere prospect of discipline at some future point in time is sufficient to create a hostile work environment. However, Cooper resigned the day before her Sabbath absence would, cumulatively with the discipline for her earlier Sabbath absences, inevitably have led to her suspension under the employer's announced rule. *Cooper*, 15 F.3d at 1378, 1379 n.1. Thus, the threat of discharge had an immediacy which contrasts sharply with the circumstances of the Goldmeiers who continued to work for Allstate until both of them had found new employment and then resigned fifty-three days before there would have been

the first actual conflict between their religious and employment requirements. Even in combination, all circumstances of employment cited by the Goldmeiers are legally insufficient to create an intolerably hostile work environment.

The Goldmeiers' constructive discharge claim also fails independently for lack of evidence that Allstate "deliberately create[d] intolerable working conditions . . . with the intention of forcing" the Goldmeiers to quit. *Moore*, 171 F.3d at 1080. "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Ibid.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). The seemingly stringent intent requirement can, however, be met "by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Ibid.* Allstate's offer of compromise after the Goldmeiers quit, on terms the Goldmeiers had earlier proposed, nevertheless, strongly suggests the absence of any such intent. While it is conceivable that this offer was not made in good faith and for the sole purpose of avoiding a claim such as the Goldmeiers raise here, there is no evidence to support a finding of such an elaborate ruse. Therefore, we conclude that there was no genuine issue of material fact that the Goldmeiers were not constructively discharged.

In the alternative to a finding that they were constructively discharged, the Goldmeiers argue that the discipline or discharge requirement found in our case law is a vestige of the pre-1991 employment discrimination law. *See, e.g.*, *Pyro Mining Co.*, 827 F.2d at 1085 (decided in 1987); *Cooper*, 15 F.3d at 1378 (decided in 1994 but adjudicating a claim arising in 1987). Prior to 1991, relief in employment discrimination suits was limited to injunctive and equitable relief, such as back pay. 42 U.S.C. § 2000e-5(g). Under this law, absent discharge or discipline, there would have been little a court could have done to help a victim of employment discrimination. The Goldmeiers argue that this court, as well as numerous other courts, inadvertently turned this limitation

on remedies into an element of the prima facie case. The 1991 amendments expanded the remedies available for intentional employment discrimination by authorizing compensatory and punitive damages. 42 U.S.C. § 1981a(a)(1). With these remedies, even a victim of employment discrimination who was not discharged or disciplined could be offered relief by the court. Hence, they argue, the discharge requirement repeatedly stated in our case law is obsolete and should not be enforced against them.

Nevertheless, for a number of reasons, we hold that discharge or discipline remains an element of a prima facie cases of religious discrimination in employment. First, we recently so held in a case undisputably interpreting the post-1991 statute. In *Virts*, arising out of events occurring in 1997, we reiterated that "[t]o establish a prima facie case, a plaintiff must demonstrate that . . . he was discharged or disciplined for failing to comply with the conflicting employment requirement." 285 F.3d at 516 (citing *Pyro Mining Co.*, 827 F.2d at 185). Even were we so inclined, absent circumstances not present here, no panel of this court has the authority to overrule the previous, published decision of another panel. *See, e.g.*, *Goad v. Mitchell*, 297 F.3d 497, 503 (6th Cir. 2002) (citing *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

Second, despite an impressive tour through the circuits, the Goldmeiers fail to discover even a single federal appellate case in the twelve years since the enactment of the amendments holding that the discharge or discipline requirement has been eviscerated. Rather, the Goldmeiers quote language requiring reasonable accommodation, trying to imply that reasonable accommodation is required without any condition precedent, without mentioning that these statements follow a previous finding, or defendant's concession, of a prima facie case. *See, e.g.*, *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) (explicitly declining to rule on the existence of a prima facie case where employee was not discharged); *Rodriguez v. City of Chicago*,

156 F.3d 771, 774-75 (7th Cir. 1998) (noting that "the [employer] had conceded that [the plaintiff] had established a prima facie case of religious discrimination" and beginning its analysis with "the issue of whether the [employer] has satisfied its duty of reasonable accommodation"). The Goldmeiers also point to one case in another circuit which upheld an injunction against an employer barring it from discharging an employee who for religious reasons refused to pay certain union dues. *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239 (9th Cir. 1981); *see also Rodriguez*, 156 F.3d at 774 (noting that the plaintiff had requested injunctive relief). But the *Tooley* court was considering the grant of an injunction, a form of relief that is necessarily directed at the prevention of some *future* violation of the law, and the future violation considered there, discharge, was exactly of the type that the Goldmeiers now argue need no longer be shown. Conversely, the Goldmeiers filed an action for damages, which must be based on the defendant's *past* adverse employment actions.[4] The fact remains that neither this court, nor any of its sister circuits with substantively parallel religious discrimination jurisprudence, has ever endorsed the Goldmeiers' conclusion that no adverse employment action need be shown to sustain a prima facie case.

Third, reading the discipline or discharge requirement out of the prima facie case creates significant analytical difficulties. Absent this requirement, a prima facie case would lie wherever there was a sincere conflict and compensation would be due when, in addition, the employer does not immediately adopt a reasonable accommodation. What a successful religious discrimination claim would not require would be any actual employer action to the detriment of the employee. Employers who, while not offering a formal

---

[4]We need not and do not decide whether the Goldmeiers' action, if brought for injunctive relief against enforcement of the SAS instead of, or in addition to, damages, could have been sustained by the district court on the facts alleged here.

accommodation, deliberately turned a blind eye to employees' religiously motivated minor deviations from the letter of company policy–not an unusual situation one would imagine–would suddenly find themselves liable as civil rights offenders.

Finally, we note that we have previously rejected a parallel argument. *Hiler v. Brown*, 177 F.3d 542, 546-57 (6th Cir. 1999) (rejecting argument that the 1991 amendments by allowing compensatory damages implicitly expanded the class of potential employment discrimination defendants beyond employers). For these reasons, we decline to follow the Goldmeiers' suggestion to remove the discipline or discharge requirement.

The parties expend considerable energy on the reasonable accommodation question prominent in the religious discrimination case law. "Once a prima facie case is established, the burden shifts to the employer to show that it could not reasonably accommodate the employee without undue hardship." *Cooper*, 15 F.3d at 1378 (citing *Pyro Mining Co.*, 827 F.2d at 1085). "To require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship." *Cooper*, 15 F.3d at 1378 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). But reasonable accommodation is not part of the prima facie case, the basis on which the district court decided the case. As we uphold the district court on the same basis, we do not rule on the reasonable accommodation question.

The Goldmeiers' other claims must fail for reasons already elucidated. Ohio State employment discrimination law under O.R.C. § 4112 tracks federal law under 42 U.S.C. § 2000e-5. *Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994). Therefore, when their federal religious discrimination claim failed, so did their state religious discrimination claim. The Goldmeiers' wrongful discharge state law claim must also fail for reasons already

given. They resigned and were not discharged, actually or constructively. Therefore, they have no claim under this heading.

## III

For the foregoing reasons, we **AFFIRM** the judgment of the district court.