**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES R. POLAND,
                    *Plaintiff-Appellee,*

          v.                                    No. 05-35508

MICHAEL CHERTOFF, Secretary of                  D.C. No.
the Department of Homeland                      CV-02-01660-AJB
Security,
                    *Defendant-Appellant.*

JAMES R. POLAND,
                    *Plaintiff-Appellee,*

          v.

MICHAEL CHERTOFF, Secretary of                  No. 05-35779
the Department of Homeland
Security,                                       D.C. No.
                    *Defendant-Appellant,*      CV-02-01660-AJB

          and                                   OPINION

PAUL O'NEILL, Secretary of
Treasury,
                    *Defendant.*

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted March 8, 2007
Submission Vacated March 13, 2007
Resubmitted April 20, 2007
Portland, Oregon

8817

Filed July 20, 2007

Before: Ronald M. Gould, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Paez

## COUNSEL

Peter D. Keisler, Assistant Attorney General, Karin J. Immergut, United States Attorney, Marleigh D. Dover and Mark R. Freeman, Attorneys, Appellate Staff Civil Division, United States Department of Justice, Washington, D.C., for defendant-appellant Michael Chertoff.

Kevin Keaney, Kevin Keaney PC, Portland, Oregon, for plaintiff-appellee James R. Poland.

## OPINION

GOULD, Circuit Judge:

After a bench trial, the district court entered a judgment in favor of James R. Poland, a former employee of the United States Customs Service, on his employment discrimination claim against the Customs Service, represented by the Secretary of the Department of Homeland Security ("Secretary"). Specifically, the district court held the Customs Service liable for violating the Age Discrimination in Employment Act ("ADEA") by retaliating against Poland after he filed Equal Employment Opportunity ("EEO") complaints and by constructively discharging Poland by transferring him to a new job in a new location. The district court based its damage award solely on the theory that Poland had been constructively discharged from the Customs Service. On the Secretary's appeal, we affirm the district court's determination that the Customs Service unlawfully retaliated against Poland for filing EEO complaints. We reverse the district court's conclusion that the Customs Service's transfer of Poland amounted to a constructive discharge, and we vacate the district court's order awarding damages to Poland on a constructive discharge theory. We also vacate the district court's award of attorneys' fees to Poland. We remand the case to the district court so that Poland can amend his complaint to seek the remedies available under his retaliation theory.

**I**

**A**

Poland, who was born in 1946, joined the United States Customs Service in 1974. Poland began his career as a customs inspector in Nogales, Arizona. In 1978, the Customs Service transferred Poland to Washington, D.C., where he served as an operations officer. The Customs Service then transferred Poland to Blaine, Washington, where Poland

worked as a special agent investigating customs crimes. In 1985, the Customs Service assigned Poland to be a supervisor in charge of six or seven special agents in Seattle, Washington. Two years later, in 1987, the Customs Service transferred Poland back to Washington, D.C., where he worked in the customs fraud investigation division. Later that year, the Customs Service reassigned Poland to be a special assistant to the Assistant Commissioner for Investigations. Poland served the Customs Service in that capacity until 1989, when the Customs Service assigned him to work with the Central Intelligence Agency as a customs advisor.

In March 1991, Poland accepted the position of Resident Agent in Charge ("RAIC") of the Customs Service's Portland, Oregon office. In Portland, Poland supervised twelve agents, a security officer, and an administrative officer. Poland also oversaw the Customs Service's branch offices in Coos Bay and Astoria.

During his first four years as RAIC of the Portland office, Poland reported to the Special Agent in Charge ("SAIC") of the Seattle Customs Service office. However, in 1995, pursuant to a reorganization of the Customs Service, Poland began reporting to Gary Hillberry, SAIC of the Denver, Colorado office. The district court found that, during the time he supervised Poland, "SAIC Hillberry was preoccupied with and frequently commented on Poland's age and the age of the majority of the special agents assigned to the Portland office." Representative conduct by Hillberry and the Denver SAIC office included:

- Telling Poland he was "too old" for career advancement with the Customs Service.

- Telling Poland on multiple occasions that the officers in the Portland office were too old.

- Refusing the request of a forty-nine-year-old special agent assigned to the Las Vegas office to

transfer to the Portland office because there were no openings in Portland and, even if there were, Hillberry wanted to put "younger agents" there.

- Telling a special agent assigned to the Denver office that Poland had a bunch of "old farts" in Portland who needed to "get with the times."

- Stating repeatedly that the personnel policies of the Customs Office of Investigations and budgetary constraints mandated that "younger agents" be brought into management positions.

- Circulating two "retirement surveys" directing Poland to provide "retirement related information" on special agents and investigators approaching retirement age.

On December 7, 1997, Poland filed an age discrimination complaint against Hillberry with the Customs Service's EEO Counselor. The next month, on January 6, 1998, Poland filed a reprisal complaint with the EEO Counselor, alleging that in retaliation for Poland's age discrimination complaint, Hillberry changed his mind regarding Poland's request to reassign an agent under Poland's supervision.

While Poland was serving as RAIC of the Portland office, Pamela Ewing was the Management Program Officer in the Denver SAIC office. Over the twenty-eight months from September 1995 (when Poland began reporting to Hillberry) to December 1997, Ewing wrote four notes to Hillberry or for Poland's file regarding Poland's conduct as RAIC of the Portland office. Between the time Poland filed his initial EEO age discrimination complaint in December 1997 and January 1999, a time period of fourteen months, Ewing wrote an additional twenty-three notes criticizing Poland's conduct. Also, over the course of his tenure as RAIC, Poland sought, but was not granted, promotions in other geographic locations.

In the spring of 1999, Hillberry requested that the Customs Service undertake an administrative inquiry into Poland's performance as RAIC of the Portland office. Hillberry alleged that Poland was confrontational, argumentative, and disrespectful toward members of the Denver SAIC office. The Customs Service initiated a formal inquiry in the summer of 1999. Witnesses selected by the Customs Service, without input from Poland, to testify before the administrative inquiry panel, testified that, as a manager, Poland was intransigent, inflexible, and unwilling to accept the views of others.

At the conclusion of the administrative inquiry, the panel found that Poland engaged in unprofessional and inappropriate conduct, and was confrontational, argumentative, retaliatory, and ineffective as a manager. The Customs Service Disciplinary Review Board reviewed the panel's conclusions and found that they lacked sufficient specificity to support an adverse employment action against Poland, but concluded that it was in the best interest of the Customs Service to reassign Poland to a nonsupervisory position somewhere other than Portland because of the Portland staff's concerns about retaliation for their participation in the administrative inquiry.

The Assistant Commissioner of Customs for the Office of Investigations, Bonni Tischler, agreed with the Review Board's recommendation and decided to reassign Poland. On February 25, 2000, Tischler notified Poland that he was being transferred to Vienna, Virginia and reassigned to the nonsupervisory position of Criminal Investigator. Poland accepted the reassignment and began working in Vienna in April 2000. After the transfer, Poland's pay and benefits remained unchanged from what they were when he was RAIC of the Portland office. In September 2000, Poland decided to take early retirement effective December 1, 2000, three years short of his December 2003 mandatory retirement date from the Customs Service.

**B**

On December 10, 2002, Poland filed his complaint in the district court alleging that the Customs Service violated the ADEA. Poland asserted three claims under the ADEA: First, he alleged disparate treatment based on the Customs Service's failure to promote him because of his age. Second, he asserted that the Customs Service initiated the administrative inquiry against him in retaliation for his engaging in the protected activity of filing EEO age discrimination complaints. Finally, he alleged that the Customs Service constructively discharged him as a result of that retaliatory inquiry.

The district court conducted a bench trial. On Poland's claim of disparate treatment based on the Customs Service's failure to promote him, the district court found in favor of the Customs Service, reasoning that Poland did not establish that his age was a motivating factor in the Customs Service's decision not to promote him because he did not present evidence that he was denied a promotion or that younger employees were promoted ahead of him.

On Poland's claim of retaliation, however, the district court ruled in Poland's favor. The district court found that Poland's performance reviews prior to Hillberry's initiation of the administrative inquiry never addressed any of the issues raised by the inquiry. Also, the district court found that the Customs Service had never disciplined Poland for any of the alleged behavior that came to light during the inquiry. Additionally, the district court found that the Customs Service's first formal discipline of Poland occurred only after he filed his first EEO age discrimination claim. The district court concluded that "the Customs Service violated the ADEA when it initiated an Administrative Inquiry in retaliation against Poland for engaging in the protected activity of filing his initial EEO complaint regarding age discrimination and filing subsequent retaliation complaints."

The district court also ruled in Poland's favor on his claim that the Customs Service violated the ADEA by constructively discharging him. Specifically, the district court concluded that "Poland was constructively discharged because the reassignment to Virginia resulted in separation from his family and demotion to a nonsupervisory position," and that "a person in Poland's circumstances would have reasonably believed the reassignment was a 'career-ending' event that compelled him to retire earlier than he planned."

In calculating the damages due Poland, the district court relied only on the constructive discharge theory, awarding Poland the compensation he lost by retiring in December 2000 instead of on his mandatory retirement date of December 2003. Specifically, the court awarded Poland: (1) the lost wages and other compensation Poland would have received from September 2000, the date of Poland's constructive discharge, to December 2003 (less taxes and mandatory retirement contributions, plus prejudgment interest); (2) the dollar value of annual leave that would have been available to Poland on his retirement date of December 2003; and (3) lost retirement benefits. The district court awarded Poland total damages of $339,130.75. The Customs Service, through the Secretary, appeals.

## II

**[1]** The Secretary first argues that Poland did not establish his claim of retaliation. We review the district court's findings of fact for clear error and review its conclusions of law de novo. *Star v. West*, 237 F.3d 1036, 1038 (9th Cir. 2001). To establish a claim of retaliation, a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the

adverse employment action. *Villiarimo v. Aloha Is. Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).**[1]**

**[2]** In this case, Poland's filing of EEO complaints was a protected activity. *See* 42 U.S.C. § 2000e-3(a); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Also, Poland suffered two adverse employment actions. An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray*, 217 F.3d at 1242-43 (internal quotation marks omitted). The adverse employment actions Poland suffered in this case were: (1) Hillberry's initiation of the administrative inquiry against him, *see Ulrich v. City and County of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002) (holding that a hospital's investigation of a doctor that threatened to take away the doctor's clinical privileges was an adverse employment action), and (2) the Customs Service's transfer of him to Virginia, *see Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that transfers of job duties can constitute adverse employment actions under Title VII); *see also Ray*, 217 F.3d at 1240 ("We have found that a wide array of disadvantageous changes in the workplace constitute adverse employment actions."). The parties vigorously dispute, however, whether Poland established the third element of his claim of retaliation —a causal link between his filing of EEO complaints and the adverse employment actions the Customs Service took against him.

**[3]** The district court correctly concluded that Hillberry's initiation of the administrative inquiry was directly caused by

---

**[1]**Although *Villiarimo* and other cases discussed in this opinion are Title VII cases, not ADEA cases, they are relevant to our ADEA analysis because "the ADEA anti-retaliation provision is 'parallel to the anti-retaliation provision contained in Title VII,' and . . . 'cases interpreting the latter provision are frequently relied upon in interpreting the former.'" *Hashimoto v. Dalton*, 118 F.3d 671, 675 n.1 (9th Cir. 1997) (quoting *Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 330 (D.C. Cir. 1991)).

Poland's filing of EEO complaints. The court also correctly concluded that Hillberry made the ultimate decision to initiate the inquiry, and therefore that his animus underlying that decision should be imputed to the Customs Service. The more difficult question is whether Poland established the required causal link[2] between his EEO complaints, Hillberry's animus, and the Customs Service's adverse employment action of transferring Poland to Virginia. The Secretary does not dispute that Hillberry harbored animus toward older workers. Hillberry, however, was not the Customs Service employee who made the ultimate decision to take the adverse employment action of transferring Poland.[3] Instead, it was Assistant Commissioner Tischler who, at the recommendation of the Review Board and the inquiry panel, decided to transfer Poland. The Secretary argues that this independent inquiry and decisionmaking process severed the causal link between

---

[2]We emphasize that this case comes to us on an appeal of a judgment entered following a bench trial and a statement of findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Thus, the questions before us are whether the district court clearly erred in concluding that the plaintiff satisfied his ultimate burden of persuasion on the element of the causal link between his protected activity and the adverse employment actions, and whether the district court correctly applied the law in reaching the conclusion that the plaintiff satisfied that burden. Our discussion of causation here does not apply to the prima facie showing of retaliation that is required at the first step of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework that applies to the claims of plaintiffs seeking to establish employment discrimination through circumstantial evidence. *See Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). At the prima facie stage of a retaliation case, "[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks omitted).

[3]The district court correctly concluded that Hillberry did make the ultimate decision to initiate the administrative inquiry against Poland and that Hillberry's animus underlying that decision should be imputed to the Customs Service.

Hillberry's animus-based initiation of the inquiry and the adverse employment action of transferring Poland, and therefore that Hillberry's animus should not be imputed to the Customs Service.

**[4]** This situation—one where a subordinate employee with bias (like Hillberry) precipitates an investigation that leads to an adverse employment action but an employee without bias makes the final decision to take the adverse action—raises difficult issues not yet addressed by our circuit concerning how involved in the investigation the biased subordinate must be for the subordinate's animus to be imputed to the employer who took the adverse employment action. As the Tenth Circuit recently explained, the agency principles underlying our employment discrimination laws, *see* 42 U.S.C. § 2000e(b) (defining "employer" to include any "person engaged in an industry affecting commerce" as well as "any agent of such a person"), along with the deterrent purpose of those laws, support the existence of some theory of subordinate bias liability. *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 485-86 (10th Cir. 2006), *cert. dismissed*, 127 S. Ct. 1931 (2007). We consider three potential rules to govern when a subordinate's bias will be imputed to an employer.

First, we could adopt a simple "but for" causation test. In cases where an employee with bias precipitates some form of inquiry, investigation, or disciplinary proceeding, the ultimate decisionmaker has no bias, and the plaintiff makes a claim of retaliation, we could ask only whether, but for engaging in his protected activity, the plaintiff would have suffered the adverse employment action.[4] The liability that can flow from

---

[4]We have applied a "but for" causation standard in certain Title VII retaliation cases. *See Villiarimo*, 281 F.3d at 1065; *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986); *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 345 (9th Cir. 1982) (per curiam). However, in none of those cases did the employer undertake an allegedly independent investigation upon the suggestion of a biased employee. Instead, in those cases, the ultimate decisionmakers were themselves allegedly biased, *see Ruggles*, 797 F.2d at 784; *Kauffman*, 695 F.2d at 345-46, or the allegedly biased subordinate had no connection to the employer's final decision to take the adverse employment action, *see Villiarimo*, 281 F.3d at 1065.

a "but for" standard of causation in subordinate bias cases is expansive. Under a "but for" standard, any time a biased employee, in response to a plaintiff's protected activity, sets in motion the process that leads to an adverse employment action, the employer would be liable, even if the employer then conducted an entirely independent inquiry and decision-making process insulated from the animus of the biased employee, and no matter how compelling the non-discriminatory grounds for taking the adverse employment action. As the Tenth Circuit has observed, such a lenient standard can "weaken[ ] the deterrent effect of subordinate bias claims by imposing liability even where an employer has diligently conducted an independent investigation." *BCI*, 450 F.3d at 487. Also, such a broad conception of liability is inconsistent with tort law principles of causation that apply to civil rights claims. Restatement (Second) of Torts § 431 cmt. a (1965) ("In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent."). Thus, "but for" causation in this context is not of itself sufficient to impute the subordinate's bias to his employer.

The second rule we consider is the one suggested in this case by the Secretary. The Secretary urges that we should impute a subordinate's animus to his or her employer only in cases in which the subordinate dominates the investigatory process and the final decision is a perfunctory approval of the biased subordinate's inclination. Courts have termed this narrow standard the "rubber stamp" or "cat's paw" approach.[5] The Fourth Circuit has adopted this view and imputes subordinate bias to an employer *only* when the final decisionmaker rubber stamps the biased decision of a subordinate. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) ("[A]n aggrieved employee who rests a discrimination claim under Title VII or the ADEA

---

[5]For a discussion of the etymology and acceptation of these two terms, see *BCI*, 450 F.3d at 484-85.

upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer."). No doubt an employer is liable for the discriminatory acts of a subordinate in cases where the biased subordinate is, as a practical matter, the actual decisionmaker. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). But liability should not be limited to those cases only. As the Tenth Circuit has observed, the Fourth Circuit seems to take the cat's paw metaphor too literally. *See BCI*, 450 F.3d at 488. The purpose of the metaphor is to draw attention to the fact "that many companies separate the decisionmaking function from the investigation and reporting functions, and that . . . bias can taint any of those functions." *Id.* The metaphor is not a causation rule. *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004) (criticizing the Fourth Circuit's approach as "inconsistent with the normal analysis of causal issues in tort litigation"). A more expansive approach to subordinate bias liability is called for in subordinate bias cases.

[5] We hold that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process. This standard is consistent with what we have suggested in previous Title VII retaliation cases, *see Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001) ("Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the [adverse employment] decision."); *Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) ("Title VII may still be violated where the ultimate

decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animus."), and with the law in a majority of the circuits, *see, e.g.*, *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (holding that "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the [manager] . . . . 'had influence or leverage over' " the ultimate decisionmaker (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000))); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (holding that an employer is liable for the discriminatory actions of employees exhibiting discriminatory animus if they "influenced or participated in the [adverse employment] decision"); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000) ("One method [of proving pretext] is to show that discriminatory comments were made by . . . those in a position to influence the decisionmaker."); *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) (holding that an employer is liable for a subordinate's discriminatory acts when the subordinate is "able to manipulate the decisionmaking process and to influence the decision"); *see also Hill*, 354 F.3d at 303 (Michael, J., dissenting) ("Most other circuits, in either mixed-motive or pretext cases, have held that when the discriminatory bias of a subordinate influences an employment decision, the employer will be charged with the subordinate's bias.").

**[6]** Thus, if an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer. *See Willis*, 118 F.3d at 547 (stating that if "the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate

is not relevant"). Conversely, even if the biased subordinate was not the principal decisionmaker, the biased subordinate's retaliatory motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision. *Bergene*, 272 F.3d at 1141.

**[7]** In this case, Hillberry, in retaliation for Poland's EEO complaints, asked the Customs Service to undertake an administrative inquiry of Poland's performance as RAIC of the Portland office. Hillberry's initiation of the administrative inquiry, on its own, would not be sufficient to impute Hillberry's animus to the Customs Service's decision to transfer Poland if the Customs Service had shielded the inquiry it subsequently undertook from Hillberry's influence. However, the inquiry panel in this case was not shielded from Hillberry's animus. Instead, the panel had access to Hillberry's lengthy memo requesting the inquiry in which he outlined numerous incidents of malfeasance by Poland. Also, Hillberry, without consulting Poland, provided a list of twenty-one witnesses for the inquiry panel to contact. Accordingly, the district court found that the inquiry panel conducted "interviews with 21 witnesses who were preselected by the Customs Service without input from Poland." Additionally, Hillberry provided and the panel considered Ewing's notes on Poland's performance. Ewing had greatly increased the frequency of these notes after Poland filed his initial EEO complaint. We cannot on this record conclude other than that Hillberry's animus had a pervasive influence on the administrative inquiry that led to the adverse employment action. Because Hillberry influenced or was involved in the inquiry, it was not sufficiently independent to break the causal chain between Poland's protected activity and the Customs Service's decision to transfer him to Virginia.

**[8]** In summary, we hold that to establish the essential element of causation in a subordinate bias case—where the investigation that led to the adverse employment decision was initiated by, and would not have happened but for, the biased

subordinate—the plaintiff must show that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the investigation leading thereto.[6] We agree with the district court that Hillberry's animus and his role in defining the scope of the inquiry and in leading the inquiry panel to evidence unfavorable to Poland unlawfully tainted the decision to transfer Poland. Because Hillberry framed and influenced the inquiry panel's investigation, the decision to transfer Poland was not independent. We affirm the district court's judgment in favor of Poland on his ADEA retaliation claim.

## III

The Secretary next contends that the district court erred in determining that Poland had been constructively discharged. Though a determination of constructive discharge is normally a factual question left to the trier of fact, *see Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987), we review de novo questions of law underlying the district court's determination. *Star*, 237 F.3d at 1038.

**[9]** "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted). The district court concluded that a reasonable person in Poland's position would have felt compelled to retire "because the reassignment to Virginia resulted in sepa-

---

[6]As we discussed above, however, the plaintiff need not make such an extensive showing to establish the minimal causal link required at the prima facie stage of a retaliation claim under the *McDonnell Douglas* burden-shifting regime.

ration from his family and demotion to a nonsupervisory posi-
tion."

**[10]** However, this evidence of transfer and demotion is
insufficient, as a matter of law, to establish a constructive dis-
charge. Instead, we have held that a

> constructive discharge occurs when the working con-
> ditions deteriorate, as a result of discrimination, to
> the point that they become sufficiently extraordinary
> and egregious to overcome the normal motivation of
> a competent, diligent, and reasonable employee to
> remain on the job to earn a livelihood and to serve
> his or her employer.

*Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir.
2000) (internal quotation marks omitted). We set the bar high
for a claim of constructive discharge because federal
antidiscrimination policies are better served when the
employee and employer attack discrimination within their
existing employment relationship, rather than when the
employee walks away and then later litigates whether his
employment situation was intolerable.[7] *Thorne v. City of El*

---

[7]Unlike some of our sister circuits, we do not require that, in addition
to proving that working conditions were intolerable, a plaintiff must estab-
lish that his employer created the intolerable conditions with the intent to
cause the employee to resign. *Compare Watson*, 823 F.2d at 361 (holding
that, to establish a claim of constructive discharge, "the plaintiff need not
show that the employer subjectively intended to force the employee to
resign"), *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 732-33 (1st Cir.
1999) (same), *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343-44 (10th Cir.
1986) (same), *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir.
1984) (same), *and Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th
Cir. 1980) (same), *with Elnashar v. Speedway SuperAmerica, LLC*, 484
F.3d 1046, 1058 (8th Cir. 2007) (requiring plaintiff to prove employer's
intent), *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003)
(same), *and Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) ("[T]he
standard for constructive discharge requires a plaintiff to show both intol-
erable working conditions and a deliberate effort by the employer to force
the employee to quit.").

*Segundo*, 802 F.2d 1131, 1134 (9th Cir. 1986); *see also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.").

**[11]** Under the facts found by the district court, Poland was not, as a matter of law, constructively discharged. Neither the district court's factual findings nor any other evidence in the record indicates that Poland's working conditions in Virginia were so poor that they trumped his motivation to earn a living. *See Brooks*, 229 F.3d at 930. In fact, Poland worked in Virginia for five months before deciding to retire. Even after he decided to retire, Poland worked the same job for three more months. As a matter of law, these are not the actions of someone who finds his working conditions so intolerable that he felt compelled to resign. *See Manatt v. Bank of America*, 339 F.3d 792, 804 (9th Cir. 2003); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999); *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991). Poland may have preferred to have remained RAIC of the Customs Service office in Portland, but "constructive discharge cannot be based upon the employee's subjective preference for one position over another." *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir. 1986), *aff'd in part and remanded in part*, 491 U.S. 701 (1989); *see Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854-55 (8th Cir. 2000).

**[12]** Because we require job conditions to be worse than those which a reasonable person could tolerate, "[a]n employee may not . . . be unreasonably sensitive to a change in job responsibilities." *Serrano-Cruz v. DFI P.R., Inc.*, 109 F.3d 23, 26 (1st Cir. 1997). For a special agent in the Customs Service, like Poland, a cross-country transfer to a new position is nothing extraordinary and would not cause a reasonable agent in Poland's shoes to feel compelled to quit. At trial, the government introduced testimony that all Customs Service special agents sign waivers acknowledging that they may be

transferred anywhere in the country for the good of the agency. Poland himself had been transferred several times, serving in Arizona, Washington, D.C., Washington State, Oregon, and, finally, Virginia. Also, although it is not a dispositive factor, the fact that Poland's transfer resulted in no decrease of salary or benefits weighs against a finding of constructive discharge. *See id.* Though the transfer was to a nonsupervisory position, this fact alone does not cause Poland's transfer to amount to a constructive discharge. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004); *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 55 (1st Cir. 2000); *McCann v. Litton Sys., Inc.*, 986 F.2d 946, 952 (5th Cir. 1993) (refusing to find a constructive discharge when the plaintiff "faced a slight decrease in pay coupled with a loss of some supervisory responsibilities").

Poland never testified that he felt compelled or forced to resign, even though the United States Supreme Court has required plaintiffs to present evidence that working conditions were so intolerable that a reasonable person would have felt compelled to resign to prove that they have been constructively discharged. *See Penn. State Police*, 542 U.S. at 141. Instead, Poland testified that he decided to take early retirement because the extended separation from his family was difficult and because his new position in Virginia was "a career ender." That testimony is not enough to establish a constructive discharge under case law requiring that an employer create working conditions that are "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood." *Brooks*, 229 F.3d at 930.[8]

---

[8]The facts pertinent to assessment of constructive termination are indeed not in dispute: Poland was transferred to a different office across the country, in his new post he was no longer a supervisor and realistically he had no opportunity for further promotion, his pay was not altered on the transfer, and he continued to work in the new position for about five

**[13]** We reverse the district court's verdict in favor of Poland on his constructive discharge claim, and we vacate the damage award based on the constructive discharge theory. Because Poland's damage award was predicated entirely on his constructive discharge theory, we remand this case and instruct the district court to give Poland the opportunity to amend his complaint to seek any remedies available under his retaliation theory.[9]

## IV

The government also argues that we must vacate the district court's award of attorneys' fees and costs to Poland. 28 U.S.C. § 2412(b), enacted as part of § 204(a) of the Equal Access to Justice Act ("EAJA"), Pub. L. No. 96-481, 94 Stat. 2321 (1980), entitles the "prevailing party" in any civil action against the United States, its agencies, or its officials to attorneys' fees and expenses. The Supreme Court has held that, for the purpose of federal fee-shifting statutes, a party is a "prevailing party" if (1) it secures a material alteration in the legal relationship of the parties and (2) that alteration is judicially

---

months. Although we conclude that the evidence Poland presented was insufficient as a matter of law to establish that he was constructively discharged, our conclusion would not change if we were reviewing the district court's factual finding under our clearly erroneous standard of review. Based on the evidence presented at trial, it was clear error for the district court to conclude that a reasonable person in Poland's situation would have felt compelled to resign because his work conditions, although a disappointment to him, were not intolerable.

[9]Under Federal Rule of Civil Procedure 15(a), leave to amend "shall be freely given when justice so requires." Though we conclude that the constructive discharge theory of damages was not warranted, because we affirm the district court's holding that Poland's transfer was unlawfully retaliatory, justice requires that Poland be permitted to amend his complaint and any applicable pre-trial order to allege any damages proximately caused by the retaliatory transfer, and to seek any appropriate remedy for the retaliation. The district court should hold such further proceedings as are appropriate to resolve the remedial issues.

sanctioned. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001); *see also Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002) (applying *Buckhannon*'s definition of "prevailing party" to the EAJA). The Supreme Court has held that a party secures a material alteration of the parties' legal relationship when it "has been awarded *some* relief by the court." *Buckhannon*, 532 U.S. at 603 (emphasis added); *see also Sole v. Wyner*, 127 S. Ct. 2188, 2194 (2007); *Hewitt v. Helms*, 482 U.S. 755, 760 (1987) (holding that a plaintiff must "receive at least some relief on the merits of his claim before he can be said to prevail"); *P.N. v. Seattle Sch. Dist. No. 1*, 474 F.3d 1165, 1170 (9th Cir. 2007).

**[14]** In this case, we have vacated the district court's order awarding damages to Poland on his constructive discharge theory. Because the court did not award Poland any other damages or form of relief, Poland has, for the moment, not obtained any relief on the merits of his claims and is therefore not a prevailing party. We thus vacate the district court's order awarding attorneys' fees and costs to Poland. However, we have also held that Poland established his claim of retaliation under the ADEA and that on remand he can seek redress for injuries suffered because of that retaliation. In the event Poland obtains any form of relief on remand, he will have secured a material change in the legal relationship between himself and the Customs Service, and once again he will be a prevailing party entitled to attorneys' fees and costs under EAJA. *See Buckhannon*, 532 U.S. at 604 (noting that the recovery of even nominal damages renders a party "prevailing"). If the district court determines that Poland is entitled to any relief on remand, we instruct the district court to reinstate its award of attorneys' fees and costs to Poland.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

PAEZ, Circuit Judge, concurring in part and dissenting in part:

I concur in all but Part III of the majority's opinion. I disagree with the majority that, in light of the factual record, the constructive discharge question can be answered as a matter of law. I also disagree with the majority's alternate holding that the district court's constructive discharge finding was clearly erroneous. Accordingly, I would affirm the district court's factual finding that Poland was constructively discharged, and I respectfully dissent as to Part III.

A constructive discharge finding requires the application of an objective standard. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"). As the majority recognizes, however, whether a plaintiff meets this objective standard "is normally a factual question left to the trier of fact." *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987); *see also Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) ("Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury."). Therefore, when we review a judgment after trial that is based on a constructive discharge finding, we ordinarily review that finding for clear error. *See Lojek v. Thomas*, 716 F.2d 675, 683 (9th Cir. 1983) ("The district court's finding that Lojek was neither subjected to intolerable employment conditions nor was he coerced to resign is not clearly erroneous."); *see also Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984) ("Exxon contends that the trial court's finding of fact that Goss was constructively discharged is clearly erroneous. We conclude that it is not.").

In *Wallace v. City of San Diego*, we recently emphasized the deference due the trier of fact, affirming the jury's con-

structive discharge finding and reversing the district court's judgment as a matter of law to the contrary:

> Although the evidence *could* be viewed to support a finding that Wallace's working conditions were "favorable" to the point of barring a constructive discharge claim . . . the jury saw it differently, and substantial evidence supports its finding. We cannot disregard the jury's verdict simply because we would have weighed the evidence differently. Put another way, we do not disagree that a jury *could have concluded* that Wallace failed to establish constructive discharge. But . . . we cannot say that the evidence permits only a conclusion that is contrary to the jury's verdict.

479 F.3d at 629.

The majority nonetheless concludes that, as a matter of law, Poland did not suffer a constructive discharge. When we have previously reversed a constructive discharge finding as a matter of law, however, we have done so in cases only involving a "single isolated instance" of employment discrimination. *See Watson*, 823 F.2d at 361 ("[W]e have noted that, in general, a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge. . . . Hence, a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment." (internal quotation marks and emphasis omitted)); *see also Wallace*, 479 F.3d at 626 ("Although a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge, we have upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." (internal quotation marks and citation omitted)).

The majority does not contend that the Customs Service subjected Poland to only a single isolated instance of discrimination or retaliation. To the contrary, the district court's factual findings establish that the Customs Service subjected Poland to differential treatment for almost a decade. *See id.* ("Wallace offered evidence of a pattern of discrimination and retaliation . . . beginning as early 1991 and continuing through August 2000."). Starting in 1992 or 1993, Poland's immediate supervisor, Gary Hillberry, frequently subjected him to discriminatory remarks and treatment. Further, in retaliation for Poland filing his first EEO complaint in 1997, Hillberry changed his mind and declined Poland's request to reassign a special agent under Poland's supervision. Hillberry also retaliated against Poland for filing his two subsequent EEO complaints in 1998 and 1999, by issuing Poland an unsubstantiated letter of admonishment and initiating and influencing the inquiry into Poland's managerial performance. Finally, as a result of that inquiry, the Customs Service demoted Poland from a high-level position supervising three offices and nineteen special agents and officers[1] that he had held for more than ten years, to a "career end[ing]," "nonessential," and "nonsupervisory" position, shuffling papers.

As Poland testified:

> Q.   And did you have any management responsibility in [your new position]?
>
> A.   No.

---

[1]As Resident Agent in Charge ("RAIC") of the Portland office, Poland supervised twelve agents, each of whom worked in either a commercial fraud group or a narcotics and money laundering group. The supervisor of each group reported directly to Poland. Poland also supervised a security officer and an administrative officer and the Customs Service's branch offices in Coos Bay (an office with three special agents) and Astoria (an office with two special agents).

Q.  Did you supervise anybody?

A.  No.

Q.  Did you — well, what were you doing?

A.  I was put in an office and told to move paper from the left side of the desk to the right side of the desk.

Q.  Okay. What does that mean?

A.  That means exactly that. Some courier would bring some paper in and I'd look it over and decide what sort of automated financial checks ought to be done, check — check the appropriate box and put it in the out box and somebody came by, picked it up and processed it.

Q.  Did your new position involve any of the kind of judgment or discretion that you had to exercise as the RAIC for Portland?

A.  None whatsoever.

Q.  And you stayed in that position for approximately how many months?

A.  Approximately a total of about — five and a half months, six months.

Q.  All right. And what did you decide to do at the end of that period?

A.  Decided it was in the best interests of my family and myself, because I didn't see — this was a career ender, that it was time to leave.

Q. Why did you decide to retire?

A. Because my career was over.

Q. Why do you say that?

A. Well, because I was in a nonsupervisory position, I was in a nonessential job, a job that had sat vacant for almost six months. My predecessor had retired. I had little interaction with anyone else. Based on my experience, watching other people's career[s] end in a similar way, I was done.

Q. Did you feel that you had any promotion or lateral assignment possibilities at that point?

A. None whatsoever.

In light of this testimony, which the district court found credible, and the seven or eight years of discrimination and retaliation prior to the demotion in Poland's duties, there was ample evidence for the district court, as trier of fact, to find that Poland was subjected to treatment sufficiently intolerable that a reasonable employee would have felt compelled to resign. *See Satterwhite v. Smith*, 744 F.2d 1380, 1382-83 (9th Cir. 1984) (affirming the district court's finding of a constructive discharge on similar facts, and discussing other similar decisions).

Further, because these circumstances are sufficient under our deferential standard of review to show that Poland suffered a constructive discharge, the district court's finding is not undermined by the evidence that the Customs Service regularly transferred its employees to different locations. Even if Poland's move across the country may not have been intolerable in and of itself, the move culminated in a drastic demotion in duties that the district court found objectively intolerable

under the circumstances. Likewise, in light of the demotion and the years of discriminatory and retaliatory treatment, the district court's finding is not undermined by the fact that Poland's pay remained the same. *See Buckley v. Hosp. Corp. of America, Inc.*, 758 F.2d 1525, 1530-31 (11th Cir. 1985) (rejecting defendant's contention that plaintiff was not constructively discharged because she was offered another position at the same pay, because plaintiff "testified she found [the new position] 'humiliating' after her years of service in supervisory positions"); *see also Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 731 (1st Cir. 1999) ("[T]he fact that salary and benefits have not been decreased has never been held to be a conclusive factor [for a constructive discharge finding] . . . ."); *Real v. Cont'l Group, Inc.*, 627 F. Supp. 434, 443 (N.D. Cal. 1986) ("Continental makes much of the fact that despite the plaintiff's demotion and job offers graded substantially below the job he held prior to June 1981, Mr. Real suffered no reduction in his salary or benefits. This fact alone is not enough to defeat the jury's finding of constructive discharge.").

Nor is the majority's reversal of the district court's factual finding justified simply because Poland worked for about five months after his demotion before resigning. We have never held that continuing to work for a period of months following an adverse employment decision precludes a constructive discharge finding. In the decisions cited by the majority, we merely *affirmed* findings that there was no constructive discharge; we did not suggest that the trier of fact could not have found to the contrary. *See Manatt v. Bank of America*, 339 F.3d 792, 804 (9th Cir. 2003); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999); *see also Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991). Also, in each of those cases, the plaintiffs conceded that the alleged discriminatory treatment had stopped entirely months or years before they resigned. Poland, however, was still subject to retaliatory treatment when he resigned, as the Customs Service kept him at a nonessential, nonsupervisory, career-ending

job, moving papers from one side of his desk to the other. Moreover, we recently held that a similar, three-month delay in resigning did not "preclude[ ] a conclusion that [the plaintiff] was constructively discharged." *Wallace*, 479 F.3d at 627. As we explained:

> Although the dissent would conclude otherwise, the jury could have viewed [the plaintiff's] efforts to stay on the job despite the intolerable conditions as evidence that he indeed had "the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (internal quotation marks omitted).

*Id.* at 629 n.7.

Accordingly, there is no basis for the majority's decision in the instant case to circumscribe a new area within which there can be no constructive discharge as a matter of law. For the same reasons, I would hold on this record that the district court's factual finding that Poland was constructively discharged was not clearly erroneous, and I would therefore affirm.