**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0838n.06

**No. 10-1172**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

**_Dec 14, 2011_**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JAMES McKELVEY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| SECRETARY OF UNITED STATES | ) | EASTERN DISTRICT OF MICHIGAN |
| ARMY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: NORRIS, SUTTON and GRIFFIN, Circuit Judges.

SUTTON, Circuit Judge. James McKelvey, an Army veteran, lost his right hand and suffered other serious injuries trying to defuse a roadside bomb in Iraq. Without question, the Nation owes him considerable gratitude and respect for his service and sacrifice. The more difficult question is whether it also owes him nearly $4.4 million in front pay because, upon returning home and securing a civilian job with the Army, he faced a work environment so hostile that he had no realistic option but to quit. We conclude that the district court did not abuse its discretion in declining to order that remedy and instead requiring the Army to make good on reinstating McKelvey to a job with higher pay.

I.

McKelvey was attempting to defuse a roadside bomb in Iraq in February 2004 when it

exploded. McKelvey lost his right hand in the incident and sustained injuries to his left hand, an eye and his lungs. After recovering at a base in Germany and at Walter Reed Army Medical Center, McKelvey moved back to Michigan, and in February 2006 he accepted a position as an operations specialist first at Selfridge Air National Guard Base and eventually at the Detroit Arsenal.

McKelvey's new job did not go well. Although his account of what transpired differs in some respects from the Secretary's, we must adopt his version of events at this stage of the litigation. *See Ford v. County of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008). In March or April 2006, one of McKelvey's coworkers told him that his supervisor, Alan Parks, was "going around telling everybody you're all fucked up from the war, you're a piece of shit, that he should have never hired you, you're worthless." R.102 at 63. Parks did not assign McKelvey enough work to keep him busy, even though his coworkers were "slammed" with work. R.102 at 66–67. And the work Parks did assign tended toward the menial. When one employee asked for help moving some boxes, Parks "kind of chuckled and he [said] . . . 'I'll send McKelvey down. He's worthless anyhow. I'll send the cripple down to you.'" R.98 at 21.

Other colleagues were equally abusive. One, Maurice "Bud" Spaulding, got "pretty indignant" about the fact that McKelvey had a handicapped parking permit even though he was not mobility-impaired, and would sometimes call McKelvey "lefty" or "cripple." R.102 at 64–65. McKelvey initially took these comments to be poor attempts at humor, and he asked Parks's supervisor, Deputy Garrison Commander Robert Graves, to suggest to Parks and Spaulding that they tone it down.

That did not happen. Between June and August 2006, the comments "changed in tone. They

didn't seem like they were meant to be a joke, and they were coming more frequently than previously." R.102 at 70. Parks and Spaulding regularly called McKelvey a "fucking cripple" and became "agitated" with him for no apparent reason. R.102 at 70. Parks continued to assign McKelvey less work than his colleagues. In August or September, McKelvey complained again to Graves about his work environment, but nothing changed. Around this time, McKelvey also sought help from Mark Lewis, the office's Equal Employment Opportunity counselor, who encouraged him to file a formal complaint, but McKelvey preferred to try to work things out on his own. McKelvey began applying for other jobs in the federal government, but could not find any in Michigan.

Things got worse. By September and October, the workplace abuse "picked up a lot," with the taunting and name-calling becoming a weekly occurrence. R.102 at 80–81. At one point, Parks sought out McKelvey to ask him to destroy boxes of paper in an industrial shredder. McKelvey said he was not comfortable putting his only good hand into the machine, which prompted Parks to call him a "fucking cripple" and walk out of the room. R.102 at 81–82. Parks also excluded McKelvey from a meeting about a planning exercise that McKelvey was supposed to coordinate. When McKelvey scheduled another appointment in December with Lewis to file a formal complaint, Lewis told him that "things aren't going to change" and suggested McKelvey find an attorney. R.102 at 86. After McKelvey filed his complaint, Parks and Spaulding "stopped calling [him] names," and Parks attempted to include McKelvey in more meetings. R.103 at 16–17.

In mid-January 2007, McKelvey met with Lieutenant Colonel Kevin Austin, the garrison commander. Austin told McKelvey, "[All] I can tell you is if you don't like the way you're being treated, go find another job." R.102 at 92. McKelvey was still trying to do just that. In late January

he met with Jason Bradley, a human resources specialist, to see if a new civilian job with the Army had opened up, but the only ones available were an out-of-state position and a job as a security guard, which would have entailed taking a pay cut and carrying a gun, which McKelvey could not realistically do. When the Oakland County Sheriff's Department offered him a job, McKelvey took it and resigned his position at the armory on February 16, 2007. According to McKelvey, he would have left much sooner, but stayed because he "ha[d] a wife and child to take care of." R.103 at 31.

In October 2007, McKelvey sued the Secretary in district court, alleging the Army had discriminated against him based on his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. After discovery, the district court granted summary judgment to the Secretary on one of McKelvey's claims (failure to make reasonable accommodations), and McKelvey voluntarily dismissed a second claim (retaliation). His remaining claims (hostile work environment and constructive discharge) went to trial. The jury ruled for McKelvey on both claims, awarding no compensatory damages on the hostile-work-environment claim but $4,388,302 in front pay on the constructive-discharge claim. After trial, the Secretary filed motions under Federal Rules of Civil Procedure 50 and 59 for judgment as a matter of law on the constructive-discharge claim and to vacate the award of front pay. The district court granted both motions, holding that McKelvey had presented insufficient evidence to sustain a finding of constructive discharge and, in the alternative, that the proper remedy for a constructive discharge would be an order reinstating McKelvey to a job at the armory, not front pay.

## II.

McKelvey first argues that the district court should not have granted the Secretary's motion

for judgment as a matter of law on his constructive-discharge claim. We agree. Judgment as a matter of law is appropriate only when "reasonable minds could come to but one conclusion, in favor of the moving party." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Reasonable jurors could have gone either way on this issue.

An employer is liable for constructive discharge when it coerces an employee to leave by creating "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). The test deliberately "sets a high bar," as the law generally expects employees to remain on the job while pursuing relief from harassment. *Porter v. Erie Foods, Int'l*, 576 F.3d 629, 639–40 (7th Cir. 2009). To determine whether that standard is met, we

> consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).

McKelvey presented evidence about three of these factors: a lack of job responsibilities relative to his colleagues, assignment to menial work and harassment. Yet the crux of this claim turns on the harassment McKelvey endured. McKelvey presented evidence that Parks and Spaulding repeatedly called him, among other derogatory things, "all fucked up," "a piece of shit," "worthless," and "a fucking cripple." R.98 at 21; R.102 at 63, 64–65, 70, 81–82. Repeated over the course of nine months, this constant stream of invective could sustain a finding of constructive discharge. It

is "sever[e]" and "humiliating," not a collection of "mere offensive utterance[s]." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). It is the sort of "repeated . . . taunting" that goes beyond what one finds in even an ordinary hostile work environment. *Lifton v. Bd. of Educ. of Chicago*, 416 F.3d 571, 578 (7th Cir. 2005); *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). Other federal courts have determined that an employer may be held liable for constructive discharge when a supervisor repeatedly calls a disabled employee a "cripple." *See Vasquez v. Atrium, Inc.*, No. 00-1265PHXLOA, 2002 WL 818066, at *6 (D. Ariz. Apr. 24, 2002); *Metzgar v. Lehigh Valley Hous. Auth.*, No. 98-CV-3304, 1999 WL 562756, at *1–3 (E.D. Pa. July 27, 1999).

But, the Secretary maintains, McKelvey waited too long to leave: even if this work environment became so intolerable that it effectively would have compelled a reasonable employee to resign, that is not what McKelvey did. He did not leave until February 2007, roughly two months later, by which time conditions had improved. This argument has some force. Plaintiffs alleging constructive discharge must establish that "the working environment *at the time of their resignation*" forced them to quit. *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 440 (6th Cir. 2006) (emphasis added). The question is whether, given the totality of the circumstances, the employee left "within a reasonable time after last being the subject of discrimination." *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991). The premise of a constructive-discharge claim is that conditions were so bad that the plaintiff was essentially fired—and people who are fired do not remain on the job for an extended period of time.

Had McKelvey stayed at the armory much longer than he did, we would be reluctant to

uphold a constructive-discharge finding. But a rational jury could have concluded that McKelvey was still constructively discharged when he resigned in February 2007. McKelvey resigned two months after filing his formal complaint, one month after meeting with Lieutenant Colonel Austin to air his grievances, and just two and a half weeks after meeting with Bradley to look for other jobs. This gap is too short for us to say as a matter of law that McKelvey's workplace was no longer intolerable, and is shorter than the gaps in cases where an employee's delay in leaving precluded a finding of constructive discharge. *See, e.g.*, *Geisler v. Folsom*, 735 F.2d 991, 992–93, 996 (6th Cir. 1984) (employee did not resign until seven months after conditions had improved); *Coffey v. Chattanooga–Hamilton County Hosp. Auth.*, No. 98-6230, 1999 WL 824870, at *3 (6th Cir. Oct. 6, 1999) (same); *Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007) (eight months); *Jeanes v. Allied Life Ins. Co.*, 300 F.3d 938, 943 (8th Cir. 2002) (six months); *Bath Iron Works*, 943 F.2d at 167 (same); *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755–56 (5th Cir. 1986) (five months), *aff'd in part and remanded in part on other grounds*, 491 U.S. 701 (1989). Other courts have permitted findings of constructive discharge despite time lapses as long as or longer than the one in this case. *See, e.g.*, *Wallace v. City of San Diego*, 479 F.3d 616, 627 (9th Cir. 2007) (three months); *Williams v. W.G. Johnson & Son, Inc.*, No. 1:08-cv-00235, 2010 WL 5583107, at *6 (N.D. Fla. Nov. 15, 2010) (47 days).

Along with the relatively short interlude between the last discrete act of discrimination and McKelvey's departure, other facts supported the jury's verdict. There had been no change in personnel at the armory that would lead McKelvey to believe that the improved work environment was anything more than a temporary respite. This sets his case apart from others where an

employee's delay in leaving proved fatal to a constructive-discharge claim. *See Geisler*, 735 F.2d at 996 (finding no constructive discharge in part because discriminatory supervisor had left before the plaintiff's resignation); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (same). And McKelvey had good reason to believe his work environment would not improve: Lewis, the employment counselor, had told him as much, and Austin, the garrison commander, had told McKelvey that if he didn't like the way he was being treated, his only option was to find another job. On this record, the jury permissibly concluded that, when McKelvey left the armory in February 2007, a reasonable person in his position would have felt forced to quit.

## III.

But that does not mean McKelvey is entitled to nearly $4.4 million in front pay. After the verdict, the district court granted the Secretary's motion to alter or amend the judgment, and determined that an order of reinstatement (requiring the Secretary to give McKelvey his job back, with improved working conditions and higher pay), rather than front pay, was the appropriate remedy. "While the determination of the precise amount of an award of front pay is a jury question, the initial determination of the propriety of an award of front pay is a matter for the court." *Arban v. West Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003). We review a district court's decision to deny front pay for an abuse of discretion, *id.*, and conclude that there was none here.

McKelvey's argument that it was an abuse of discretion for the district court not to order front pay faces several hurdles. Reinstatement "is the presumptively favored equitable remedy" when an employee is improperly discharged, so it "should be granted in the ordinary case." *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993). And while we have in the past *upheld*

district courts' awards of front pay, McKelvey has cited no case (nor are we aware of any) in which this court has held that a district court abused its discretion in *declining* to award front pay.

McKelvey has not shown why this case should be the first. In deciding whether to award front pay, district courts must consider several factors, including "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, [and] the discount tables to determine the present value of future damages." *Id.* at 399. These factors counsel against an award of front pay here. McKelvey can be reinstated to work at the armory quickly, without disrupting operations and without displacing another employee. In point of fact, the Army continues to offer him a position at the armory at a higher salary than he was earning before and under new supervisors. McKelvey's relatively young age, 38, likewise suggests that front pay is not appropriate, since it requires highly speculative projections about his earning capacity and about employment decisions decades into the future. *See Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir. 1984).

McKelvey offers two main arguments in response. The first is that we have sometimes observed that even though reinstatement is the preferred remedy, "it is not appropriate where the plaintiff has found other work." *Arban*, 345 F.3d at 406. But McKelvey's new job does not on its own mean the district court abused its discretion in declining to award front pay. Even if a plaintiff chooses not to seek reinstatement, "she [is] not automatically entitled to an award of front pay." *Roush*, 10 F.3d at 398. The district court still must apply the relevant factors, which, we repeat, support the court's decision not to award front pay in this case.

That brings us to McKelvey's second argument: that reinstatement is inappropriate because returning to his old workplace would be too traumatic. But, as the district court noted, "such feelings likely exist in every discrimination case," and are mitigated here by the fact that, were McKelvey to return to the armory, his supervisors and four of his six co-workers would be new, with no connection to the harassment he suffered. R.87 at 9–10; *see also Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir. 1990) (grounds for not ordering reinstatement "must be more compelling than the personal preferences and distrusts which accompanied the initial discriminatory activity"). At the end of the day, McKelvey's arguments at best suggest it is possible the district court would not have abused its discretion had it ordered front pay. *See Fuhr v. School Dist. of Hazel Park*, 364 F.3d 753, 761 (6th Cir. 2004). They do not show that the district court abused its discretion by *not* ordering front pay.

IV.

For these reasons, we reverse the district court's grant of judgment as a matter of law to the Secretary on McKelvey's constructive-discharge claim, and we affirm the district court's alternative conclusion that reinstatement, rather than front pay, is the appropriate prospective remedy. We remand the case to the district court for proceedings consistent with this opinion, including a calculation of the amount McKelvey should receive in back pay for the period of time between his discharge and the Secretary's offer of reinstatement. *See Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678–79 (6th Cir. 2008); *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996).