**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0021n.06

No. 19-5332

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 15, 2020
DEBORAH S. HUNT, Clerk

KRISTINA VONDERHAAR,                )
                                    )
    **Plaintiff–Appellant,**        )       ON APPEAL FROM THE
                                    )       UNITED STATES DISTRICT
v.                                  )       COURT FOR THE EASTERN
                                    )       DISTRICT OF KENTUCKY
AMY WAYMIRE and AT&T MOBILITY       )
SERVICES, LLC,                      )
                                    )       **OPINION**
    **Defendant–Appellees.**        )
                                    )

BEFORE: MOORE, CLAY, and SUTTON, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Kristina Vonderhaar accuses her erstwhile employer, AT&T Mobility Services, LLC ("AT&T"), of violating the Family and Medical Leave Act ("FMLA") and Kentucky wrongful-discharge law. Most significantly, Vonderhaar alleges that, after she used a significant amount of her medical leave, and then complained to AT&T's "ethics hotline" about "fraudulent" activity occurring at the AT&T store where she worked, her supervisors retaliated against her by making her working conditions so miserable that she had no choice but to resign. The district court, however, granted AT&T summary judgment, finding that Vonderhaar's claims lacked evidentiary support or were otherwise improperly asserted. Vonderhaar now appeals that judgment. We **AFFIRM**.

## I. BACKGROUND[1]

### A. Factual Background

1. <u>September 15, 2013 to April 16, 2015</u>: Vonderhaar Uses Her Medical Leave and Experiences Other Attendance Issues

On September 15, 2013, Vonderhaar began working as a "retail sales consultant" at an AT&T store in Maysville, Kentucky. Nothing of note occurred during Vonderhaar's first year of employment. In November 2014, however, Vonderhaar underwent a partial hysterectomy surgery, followed by a few related surgeries in the weeks thereafter. As a result of these surgeries, Vonderhaar requested, and AT&T approved, an FMLA leave of absence lasting from November 24, 2014 to February 2, 2015. R.36-6 (Villarreal Dec. ¶ 13) (Page ID #358). Unfortunately, shortly after returning from this leave of absence, Vonderhaar experienced heart palpitations. As a result, Vonderhaar requested, and AT&T again approved, a series of "intermittent" FMLA absences, ranging from February 19, 2015 to April 16, 2015. *Id*. ¶ 15.

Importantly, though, in addition to taking this (approved) time off for medical leave, Vonderhaar missed at least the following six days of work, *without* requesting FMLA leave: (1) November 15, 2014; (2) November 21, 2014; (3) February 4, 2015; (4) February 11, 2015; (5) March 21, 2015; and (6) April 2, 2015. *See* R.38-10 (Vonderhaar Attendance Records) (Page ID #687–90); R.36-2 (Vonderhaar FMLA Request Forms) (Page ID #285–301). As these absences occurred, and in accordance with AT&T's progressive disciplinary policy, Vonderhaar received a series of letters warning her that, if she continued to accrue unexcused absences, she "could" be

---

[1]Although Vonderhaar has technically brought suit against AT&T *and* Amy Waymire—one of her former supervisors—for ease of reference we refer to defendants as simply "AT&T" throughout this opinion.

subject to "further discipline, up to and including dismissal."  R.38-6 (Feb. 16, 2015 Counseling Notice) (Page ID #546); *accord, e.g.*, R.38-9 (Mar. 6, 2015 Written Warning) (Page ID #682); R.36-4 (Apr. 16, 2015 Final Written Warning) (Page ID #343–44).

The most prominent of these letters was the April 16, 2015 "final written warning."  This letter listed the six unexcused absences noted above and essentially said that Vonderhaar could be fired if she missed one more day of work without excuse (because company policy authorized termination after seven unexcused absences).  R.36-4 (Apr. 16, 2015 Final Written Warning) (Page ID #343–44); *see also* R.36-5 (Hoskins Dec., Ex. 1) (Attendance Policy) (Page ID #354).  There is no record evidence suggesting this final warning was factually inaccurate, or was applied in a manner inconsistent with AT&T policy.[2]

**2.  February 2, 2015 to April 16, 2015:  During the Same Time Period, Vonderhaar Sees Her Co-Workers Committing Allegedly Fraudulent Acts, and Then Reports (some of) that Misconduct to Management**

Attendance, however, was not the only issue on Vonderhaar's mind after she returned from her leave of absence.  Rather, as Vonderhaar tells it, during this same time period—early to mid-

---

[2]To be sure, as Vonderhaar emphasizes in her brief, the *March 6* "written warning" listed "February 19, 2015" as an unexcused absence when, in fact, that absence was approved for FMLA leave.  As AT&T correctly notes in response, however, the only reason February 19 was listed as "unexcused" in the March 6 letter was because Vonderhaar did not submit her medical certification for that date until March 6, and AT&T did not approve that certification until March 9.  R.36-2 (Vonderhaar FMLA Request Forms) (Page ID #286); R.36-6 (Villarreal Dec. ¶ 14) (Page ID #358).  After AT&T received Vonderhaar's medical certification, though, the February 19 absence "was changed to an approved FMLA absence."  R.43-1 (Villarreal Reply Dec. ¶ 10) (Page ID #851); *see also* R.38-10 (Vonderhaar Attendance Records) (Page ID #690) (reflecting this change).  It is accordingly not mentioned in the April 16 final warning.

Moreover, although Vonderhaar intimates in her brief that two other dates included in the final written warning should have been covered by the FMLA—February 4 and February 11—she points to no evidence in support of that contention.

2015—she repeatedly caught her colleagues engaging in "fraudulent behavior." At her deposition, she emphasized the following three incidents.

*The Shane Hampton "Temporary Phone Number" Incident*: Vonderhaar first testified that, sometime in February 2015, one of her colleagues, Shane Hampton, began unnecessarily adding temporary phone numbers to customer accounts. More specifically, Vonderhaar alleged, Hampton gave customers "temporary numbers" when they transferred an existing phone line to AT&T, instead of the new permanent number he should have been giving them. R.38-5 (Vonderhaar Dep. at 62–63) (Page ID #478). As a result, to secure their permanent number, customers were forced to interact with AT&T a second time, which then artificially boosted the sales commissions of employees like Hampton (because the employee could count both the temporary number and the permanent number as a sale). Although Vonderhaar acknowledges that nobody at AT&T requested that she engage in this "temporary phone number" tactic, *id*. at 67–68 (Page ID #479), because Vonderhaar (correctly) believed the tactic violated company policy, she raised the issue with one of her store managers, Hannah Eaves. Eaves then "sat [the store employees] down . . . and said, you know, no more temporary phone numbers." *Id*. at 67 (Page ID #479). The record does not indicate whether employees continued to use the "temporary phone number" tactic after Eaves's sit-down.

*The Insurance Incident*: Vonderhaar also testified that her colleagues would "add[] insurance to [customer] accounts" without informing the customer they were doing so. *Id*. at 80–81 (Page ID #482). Although Vonderhaar was not "pushed" to take this action either, she (with good reason) thought her colleagues' actions to be unethical. *Id*. at 83–84 (Page ID #483). Unlike the temporary phone number incident, though, Vonderhaar did not report her specific concerns

about this issue to management. *See id*. at 83 (Page ID #483) ("**Q:** Okay. Did you tell [your managers] something specific about this insurance thing being added to the customer accounts? **A:** I just told them that I knew that fraud was still being committed on the accounts. They never asked me to go into detail.").

*The Jamie Davis "Promotional Tablet" Incident*: Finally, Vonderhaar testified, on April 7, 2015, she learned that another one of her colleagues, Jamie Davis, had "sold" a free promotional tablet to a customer to whom Vonderhaar had already sold such a tablet. *Id*. at 69–73 (Page ID #479–80). This "double sale" occurred because an unknown person at AT&T cancelled the customer's original tablet order (the one made by Vonderhaar), which then prompted the customer to call the AT&T store to inquire into her tablet's status.[3] When Davis answered the confused customer's call, she decided the best course of action was to sell a "second" promotional tablet to the customer over the phone, with a tablet already in stock. When the customer visited the store the next day to pick up her tablet, however, Vonderhaar realized that Davis had signed a new two-year tablet service contract on behalf of the customer (because the customer had spoken to Davis over the phone), in violation of the company's policy that these kinds of contracts need to be consummated in person. *See* R.38-13 (AT&T Davis Investigation) (Page ID #719–34). Although Vonderhaar again concedes that nobody at AT&T requested that she sign contracts on behalf of customers, R.38-5 (Vonderhaar Dep. at 79) (Page ID #482), Vonderhaar nonetheless felt that her colleague's behavior was so fraudulent that it warranted not only a report to Eaves—the store manager—but also an anonymous complaint to AT&T "ethics hotline," which Vonderhaar called

---

[3]Because the tablet was not in stock at the time Vonderhaar made the original sale, Vonderhaar had arranged for the product to be shipped to the customer's home address. This explains why the customer was calling to inquire about the status of the tablet.

the next day, April 8, 2015. R.38-5 (Vonderhaar Dep. at 73–78) (Page ID #480–82); R.38-13 (AT&T Davis Investigation) (Page ID #725).[4]

### 3. April 17, 2015 to May 28, 2015: After Meeting with Her Supervisors, Vonderhaar Allegedly Is Forced to Take a Month-Long FMLA Leave of Absence

One day after the final attendance warning, and two weeks after the Jamie Davis hotline call, on April 17, 2015, AT&T's regional retail manager, Amy Waymire, and Vonderhaar's store managers, Fred Hoskins and Hannah Eaves, met with Vonderhaar.[5]

According to Waymire, the purpose of the meeting was not to discipline Vonderhaar, but, rather, to see what the company could do to help its struggling employee. R.38-14 (Waymire Dep. at 5–6, 136) (Page ID #736, 768). More specifically, Waymire was concerned about Vonderhaar's string of unexcused absences, and about two mid-March incidents where Vonderhaar used profanity with her colleagues, all of which Waymire described as "not typical of what we had seen from [Vonderhaar] before." *Id*. at 5–8 (Page ID #736). As Waymire remembers it, Vonderhaar began the meeting in a "defensive" posture. However, Waymire insists, as the meeting unfolded, Vonderhaar affirmatively opened up about "the specifics of things on an outside basis that weren't involving the store that were affecting her." *Id*. at 135–36 (Page ID #768). Most notably,

---

[4]AT&T conducted an investigation and ultimately determined that Davis did violate company policy when she consummated this transaction over the phone. *See* R.38-13 (AT&T Davis Investigation) (Page ID #721, 728–29). Because AT&T did not reach this determination until July 9, 2015, a month after Vonderhaar left the company, however, we do not focus on it here.

[5]As a point of context, it is unclear if Waymire knew, at the time of this meeting, that Vonderhaar was the anonymous "Davis complainant." On the one hand, the Davis investigation report indicates that Hoskins discussed the complaint with Waymire sometime on or before April 21, 2015, albeit without (in theory) knowing who the anonymous complainant was. R.38-13 (AT&T Davis Investigation) (Page ID #726). On the other hand, Waymire unequivocally testified at her deposition that she did not know Vonderhaar was the anonymous caller until mid-way through *this* litigation, R.38-14 (Waymire Dep. at 89) (Page ID #757), a statement Vonderhaar has not seriously attempted to rebut, *see, e.g.*, R.38-5 (Vonderhaar Dep. at 125) (Page ID #493) (acknowledging that she has "no personal knowledge to know if Ms. Waymire knew about the call or not"). Because this point is not essential to our ultimate resolution, though, we need not resolve it here.

Vonderhaar purportedly explained that, since undergoing the November surgery, she had not been "feeling like she [was] truly healed to be back at work." *Id.* This revelation, in turn, prompted Waymire to encourage Vonderhaar to talk to her doctor about using more FMLA time. Waymire also purportedly informed Vonderhaar that short-term disability payments could cover most of Vonderhaar's paycheck while she was out. *Id.* at 136–38 (Page ID #768–69). After the meeting concluded, Waymire recalled, Vonderhaar simply "went and contacted her doctor and worked with [HR] and took some [FMLA] time off." *Id.* at 139 (Page ID #769).

Vonderhaar tells a dramatically different story. In Vonderhaar's recollection, Waymire began the meeting by telling Vonderhaar she *had* to take a leave of absence, whether unpaid or through a combination of FMLA and short-term disability. R.38-5 (Vonderhaar Dep. at 100–01) (Page ID #487). If Vonderhaar did not do this, Hoskins allegedly added, she would lose her job. *Id.* at 101, 106 (Page ID #487, 489). Vonderhaar also recalls "being told" that she was "resentful" toward the company, and was "too emotional or too hormonal to perform [her] job." *Id.* at 102 (Page ID #488). Vonderhaar took these statements to mean she should stop reporting "fraud," and should stop using so much FMLA time (although she acknowledges no one used those exact words at the meeting). *Id.* at 101, 137 (Page ID #487, 496).

Whatever actually happened on April 17, there is no dispute that, after the meeting, Vonderhaar requested, and AT&T approved, an FMLA leave of absence to last approximately one month, from April 21, 2015 to May 27, 2015. R.36-6 (Villarreal Dec. ¶ 17) (Page ID #358). According to AT&T's attendance records, short-term disability benefits covered Vonderhaar's entire salary for the first half of her absence, and then approximately 60% of her salary thereafter. R.38-10 (Vonderhaar Attendance Records) (Page ID #690–91).

7

Frustrated by this turn of events, on May 21, 2015, near the end of her leave period, Vonderhaar decided to file an internal complaint against Waymire. In it, Vonderhaar claimed that Waymire "forced her to take a leave of absence . . . in retaliation for [her] complaining about fraud being perpetrated on customer accounts." R.36-8 (Woods Dec. ¶ 4) (Page ID #400). An AT&T human resources investigator interviewed Vonderhaar about these allegations a few days later. *Id.*[6]

### 4. <u>May 28, 2015 to June 10, 2015</u>: Two Weeks After Returning from Her Leave of Absence, Vonderhaar Resigns

Vonderhaar returned from her leave of absence on May 28, 2015. At that point in time, AT&T placed Vonderhaar back at her standard salary and position, with no reduction in job responsibilities. *See* R.38-5 (Vonderhaar Dep. at 119) (Page ID #492) (**Q:** Okay. And did you come back to work to your same position? **A:** Yes, ma'am. **Q:** And your same salary, everything is the same? **A:** Yes, ma'am."); *id.* at 149 (Page ID #499) (same). What's more, about a week after her return, Vonderhaar requested, and AT&T approved, two additional days of FMLA leave, just as AT&T had done in the months leading up to her leave of absence. *See* R.36-6 (Villarreal Dec. ¶¶ 20–21) (Page ID #359) (discussing Vonderhaar's May 30 and June 5, 2015 absences).

Nonetheless, the following events quickly convinced Vonderhaar that "the writing [was] on the wall," and that she had no choice but to resign. R.38-5 (Vonderhaar Dep. at 137) (Page ID #496).

---

[6]The investigator interviewed Eaves, Hoskins, and Waymire, too, before ultimately deeming Vonderhaar's allegations unsubstantiated. R.36-8 (Woods Dec. ¶¶ 4–5) (Page ID #400). Again, though, because this determination occurred long after Vonderhaar left AT&T (on July 9, 2015, to be exact), we do not focus on it here.

First, Hoskins did not offer Vonderhaar any "coaching sessions" to explain what she "should be doing numbers-wise." *Id*. at 141 (Page ID #497). Without these sessions, Vonderhaar claimed, she could not make her sales numbers. *Id*. at 141, 149 (Page ID #497, 499). *But cf. id*. at 144 (Page ID #498) (acknowledging that she never asked for coaching during this time period either).

Second, the two times Waymire visited Vonderhaar's store during the two-week span between Vonderhaar's return and her resignation, Waymire never said "hi" or "bye," and "would not even make eye contact with [Vonderhaar]." *Id*. at 142 (Page ID #498).

Third, Hoskins did not respond when a "belligerent" male customer "verbally attacked" Vonderhaar in "the middle of the sales floor," which necessitated another colleague interceding on Vonderhaar's behalf. *Id*. at 139–41 (Page ID #497).

Consequently, on June 10, 2015, Vonderhaar resigned. Her resignation e-mail read as follows:

> Dear Fred [Hoskins],
>
> It is with reluctance in my heart that I must inform you of my plans to resign my position as Retail Sales Consultant. My last day will be Wednesday June 24th. The past two years have truly been a blessing and it's with a heavy heart that I must step down. I feel as if I owe it to you and the company to be honest in regards to my departure.
>
> It's obvious that certain individuals have been allowed to cross certain boundaries that the rest of the staff and myself would never dare cross resulting in fraud to be perpetrated on customer accounts with no repercussions for said actions. I went as far as calling our Corporate Ethics Line and reporting the fraud yet as of yesterday it's still continuing to happen.[7]  After my call to corporate I was asked to take a

---

[7]The record does not indicate what "fraud" Vonderhaar believed was "still continuing to happen" at this point in time.

9

> leave of absence which regrettably I did. Since my return I don't feel welcome by certain members of management and feel it is best if I step down.
>
> I truly hope that things here can be resolved and the rest of the staff can begin to feel that they work in an equal playing field. This is a great group of people whom put forth their best efforts every day and have become lifelong friends of mine and I wish them all the best as well as yourself.
>
> Sincerely,
> Kristina Vonderhaar

R.38-15 (Vonderhaar Resignation E-mail) (Page ID #801).

Notably, there is no evidence that, at any point in time, AT&T denied Vonderhaar FMLA time when she requested it. *See, e.g.*, R.38-5 (Vonderhaar Dep. at 52) (Page ID #475) ("**Q:** Okay. What is your recollection in terms of your FMLA requests, were they approved or denied? **A:** As far as I know they were approved, yes. **Q:** All of them were approved? **A:** Yes, as far as I know."). Indeed, at the time of her resignation, Vonderhaar still had at least three-and-a-half hours remaining of FMLA time for the year. R.38-10 (Vonderhaar Attendance Records) (Page ID #693).

**B. Procedural Background**

**1. The Complaint**

Two years later, on June 7, 2017, Vonderhaar filed a complaint against AT&T and Waymire in Kentucky state court, which AT&T timely removed to federal court. In her complaint, Vonderhaar asserted five claims that are relevant here: (1) interference with her FMLA rights; (2) retaliation for asserting her FMLA rights; (3) wrongful discharge under Kentucky law; (4) intentional infliction of emotional distress under Kentucky law; and (5) negligent infliction of emotional distress under Kentucky law.

One aspect of Vonderhaar's complaint bears emphasis. In describing her FMLA interference claim, Vonderhaar used the following language:

> Defendants denied Plaintiff FMLA benefits to which Plaintiff was entitled *by forcing Plaintiff to take FMLA leave* [from April 21 to May 27, 2015] in retaliation for her failure and/or refusal to violate the law, and for taking prior leave, *thus depleting Plaintiff's FMLA entitlement*.

R.1-1 (Compl. ¶ 26) (Page ID #12) (emphasis added). In other words, Vonderhaar accused AT&T of interfering with her FMLA rights by "forcing [her] to take FMLA leave" when she did not want to, *not* of interfering with her FMLA rights by denying her requests for leave, or by otherwise impeding her ability to request leave, as is typical in most FMLA interference cases.

## 2. Summary Judgment

Following discovery, AT&T moved for summary judgment. In its motion, AT&T argued (among other things) that Vonderhaar's FMLA interference claim was meritless because there was no evidence that Vonderhaar's month-long leave of absence, even assuming it was "involuntary," "depleted" her FMLA entitlement. Without such a showing, AT&T observed, Vonderhaar's interference claim failed as a matter of law. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007) (holding that an "involuntary leave" interference claim "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the [employer] wrongfully forced [the employee] to use FMLA leave in the past").

In her opposition brief, Vonderhaar did not discuss the "involuntary leave" theory emphasized in her complaint, or AT&T's cited Sixth Circuit precedent. Rather, Vonderhaar shifted gears and claimed that AT&T was ignoring a multitude of *other*, hitherto-unknown bases

for her FMLA interference claim. Specifically, Vonderhaar asserted, the following nine actions constituted "unlawful interference":

- Punishing Vonderhaar for her February 19, 2015 FMLA absence;
- Threatening Vonderhaar with termination for her February 19, 2015 FMLA absence;
- Placing Vonderhaar on formal discipline and an action plan for her February 19, 2015 absence;
- Refusing to grant Vonderhaar FMLA time for her February 4 and 11, 2015 absences;
- Putting Vonderhaar on formal discipline, an action plan, and a final written warning for attendance on the basis of her February 4 and 11, 2015 absences;
- Stating that Vonderhaar was too emotional to do her job because of her hysterectomy;
- Setting up a system for AT&T FMLA approval that conflicted with other AT&T departments regarding attendance, leading to discipline for qualified FMLA days;
- Refusing to provide Vonderhaar with coaching sessions, sales goals, and job duties after she returned from her forced leave; and
- Constructively discharging Vonderhaar on June 10, 2015.

R.38 (Vonderhaar Summ. J. Opp. Br. at 16) (Page ID #420). Because AT&T failed to raise these issues in its motion, Vonderhaar continued, AT&T had "waived all argument that these actions are not interference." *Id*.

In reply, AT&T accused Vonderhaar of changing her entire theory of the case in her opposition brief (at least with respect to her interference claim), a litigation tactic that is generally verboten. AT&T also argued that, even if the court considered Vonderhaar's new FMLA interference theories, the claims failed for want of evidentiary support.

Vonderhaar did not move to amend her complaint in response to this briefing.

On March 11, 2019, the district court issued a written order granting AT&T's summary judgment motion in full. *See Vonderhaar v. AT&T Mobility Servs., LLC*, No. 17-cv-114

(WOB/CJS), 2019 WL 1120117 (E.D. Ky. Mar. 11, 2019).[8]   The district court thoroughly discussed the facts and law surrounding Vonderhaar's claims, and ultimately concluded that AT&T was entitled to summary judgment on every count of Vonderhaar's complaint.  And, as for Vonderhaar's nine new FMLA interference theories, the district court found that they were based on new allegations not found in the complaint, and were therefore improper.  The district court alternatively held that, even if the court considered Vonderhaar's claims about the (allegedly) denied February 2015 requests for FMLA leave, the claims were meritless because "there [was] no medical certification, e-mail, or request form before the Court concerning these dates."  *Id.* at *6.

Vonderhaar timely appealed.

## II.  DISCUSSION

We review de novo a district court's grant of summary judgment.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although "[i]n evaluating the evidence, we draw all reasonable inferences in favor of [the non-movant]"—here, Vonderhaar—"[a] mere scintilla of evidence in support of [Vonderhaar's] position will be insufficient for her claim[s] to survive summary judgment."  *Donald*, 667 F.3d at 760–61.  "Rather, there must be enough evidence such that the jury could reasonably find for her."  *Id*. at 761.

---

[8]Technically, the district court issued its opinion and order on March 8, 2019, and then issued an amended opinion on March 11.  As best we can tell, the opinions are materially identical, and so we cite the amended opinion throughout this decision.

## A. FMLA Interference

The FMLA entitles an employee to twelve weeks of unpaid leave because of, among other events, a serious health condition. 29 U.S.C. § 2612. To ensure that employers fully comply with this entitlement, the FMLA bars employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the statute]." *Id*. § 2615(a)(1); *see also id*. § 2617(a)(2) (providing private right of action). To state a claim of "FMLA interference," then, an employee must show (1) that they were an eligible employee, (2) that their employer was a covered employer, (3) that they were entitled to leave under the FMLA, (4) that they gave their employer notice of their intention to take leave, and (5) that their employer denied or interfered with FMLA benefits to which they were entitled. *See Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014). Further, although unlawful interference could occur when an employer merely attempts to "discourag[e] an employee from using [FMLA] leave," 29 C.F.R. § 825.220(b), the employee must, in all cases, show that their employer's interference prejudiced them, or "caused them harm," within the meaning of the statute, *Wallace*, 764 F.3d at 585 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)); *accord Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89–90 (2002). For this reason, an employee cannot claim that their employer interfered with their FMLA rights by "forcing" them to take leave, unless the employee can also show that they requested "FMLA leave at a later date, and such leave [was] not available." *Wysong*, 503 F.3d at 449.

### 1. Scope of Interference Claim

Before addressing the merits of Vonderhaar's interference claim, we must first determine what aspects of the claim are properly before us. "It is well-settled that a plaintiff may not expand

its claims to assert new theories in response to summary judgment . . . ." *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Rather, if a plaintiff wishes to expand their claim mid-stream—because, for instance, they unearthed new evidence of misconduct in discovery—"the proper procedure . . . is to amend the complaint in accordance with Rule 15(a)." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)). This rule exists to protect defendants from "unfair surprise" when moving for summary judgment. *Id*.

Vonderhaar violated these principles here. In her brief in opposition to AT&T's summary-judgment motion, Vonderhaar expanded her FMLA interference claim to include theories of recovery that bore no resemblance whatsoever to the singular "involuntary leave" theory raised in her complaint, which AT&T had (sensibly) focused on during its deposition of Vonderhaar and in its initial summary-judgment brief. Worse yet, Vonderhaar's new theories were directly contradictory to her original theory, in that her original theory argued that AT&T interfered with her FMLA rights by forcing her to use so much FMLA time that it unfairly "depleted" her statutory entitlement, whereas her new theories contended that AT&T interfered with her FMLA rights by preventing her from accessing that entitlement in the first place. As a result, Vonderhaar's opposition brief can fairly be described as the kind of "unfair surprise" that should be prevented in federal court. *Tucker*, 407 F.3d at 788.

In response, Vonderhaar seems to argue that, because this rule has generally been used to prevent parties from raising new *causes of action* in response to a summary-judgment motion, and

15

because she did not do that here, AT&T should have been on notice that her interference claim was more expansive than the literal words in her complaint. But Vonderhaar understates the scope of our rule. In *Renner*, for instance, we applied this rule to a plaintiff who changed the "basis" for his (singular) Labor-Management Relations Act § 301 claim "for the first time" in response to a motion for summary judgment. *Renner*, 516 F. App'x at 504. We ruled likewise in *Desparois v. Perrysburg Exempted Village School District*, 455 F. App'x 659, 666 (6th Cir. 2012), in the context of a (singular) procedural-due-process claim. We see no reason to reach a different outcome here. Accordingly, we address only the "involuntary leave" interference theory raised in Vonderhaar's complaint, not the nine new theories raised for the first time in her summary-judgment opposition brief.

## 2. Merits of Interference Claim

As noted above, in her complaint, Vonderhaar contended that AT&T interfered with her FMLA rights by forcing her to take an extended leave of absence, which then "depleted" her FMLA entitlement. But the question is not whether AT&T forced Vonderhaar to use FMLA leave. If that were the standard, an employee could raise an FMLA interference claim any time they took FMLA leave. Rather, the question is whether AT&T forced Vonderhaar to take FMLA leave, and then, at a later date, denied Vonderhaar additional FMLA leave on grounds that she had already used up her allotment for the year. In other words, as we held in *Wysong*, an "involuntary leave" interference claim "ripens *only* when and if the employee seeks FMLA leave at a later date, and such leave is not available because the [employer] wrongfully forced [the employee] to use FMLA leave in the past." *Wysong*, 503 F.3d at 449 (emphasis added).

16

Here, though, the undisputed record shows (1) that AT&T granted Vonderhaar two additional FMLA days after she returned from the forced leave of absence, (2) that, even after taking this additional time off, Vonderhaar still had unused FMLA leave at the time of her resignation, and (3) that, in any event, AT&T never denied Vonderhaar FMLA leave when she requested it, either before or after the alleged forced leave of absence. Vonderhaar's interference claim therefore fails as a matter of law.[9] *See, e.g.*, *Huffman v. Speedway LLC*, 621 F. App'x 792, 797 (6th Cir. 2015); *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 487–88 (6th Cir. 2013).

## B. FMLA Retaliation

In addition to prohibiting employers from "interfering with" their employees' exercise of FMLA rights, the FMLA bars employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). To state a prima facie case of "FMLA retaliation," then, an employee must show (1) that they were engaged in a statutorily protected activity; (2) that their employer knew they were exercising their FMLA rights; (3) that they suffered an adverse employment action; and (4) "a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). "This prohibition includes retaliatory discharge for taking leave," and may be proven "through either direct or indirect evidence." *Marshall v. Rawlings Co.*, 854 F.3d 368, 376–77 (6th Cir. 2017) (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003)). When relying on

---

[9]Indeed, Vonderhaar has never argued to the contrary, either in this court or in the lower court.

"indirect evidence," though, an employee must proceed under the *McDonnell Douglas* burden-shifting framework, just as in any other employment discrimination case. *Id*. at 379.

Moreover, when asserting a claim of retaliatory *constructive* discharge—the kind of adverse employment action at issue here—an employee must also point to evidence from which a reasonable juror could find (1) that the employee's working conditions were "objectively intolerable" at or around the time of their resignation, and (2) that the employer "deliberately created those conditions in hopes that they would force [the employee] to quit." *Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 630 (6th Cir. 2018). This first prong presents a formidable hurdle, as "[h]urt feelings and public criticism alone are insufficient to establish the existence of intolerable working conditions." *Festerman v. County of Wayne*, 611 F. App'x 310, 320 (6th Cir. 2015). Rather, the employee must show "that a reasonable person would have felt compelled to resign" under the circumstances. *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 535 (6th Cir. 2011) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)); *see also Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (collecting non-cumulative list of factors to consider when deciding whether an employee's working conditions were "objectively intolerable").

The precise contours of Vonderhaar's retaliation claim are hazy, admittedly. It is unclear, for instance, whether Vonderhaar is advancing a claim based on direct or indirect evidence of retaliatory intent. It is also unclear whether Vonderhaar thinks that AT&T retaliated against her because of her surgery-based leave of absence, or because of her general use of FMLA leave. At bottom, however, we interpret Vonderhaar's claim simply to be that AT&T (and, more specifically, Waymire and Hoskins) constructively discharged her in retaliation for her exercising

her right to take medical leave. *See* R.1-1 (Compl. ¶¶ 28–33) (Page ID #12); Appellant's Br. at 35–44.

The problem is, even construing Vonderhaar's retaliation claim generously, no reasonable juror could find that AT&T constructively discharged her. And, absent evidence of constructive discharge (or any other "adverse employment action"[10]), Vonderhaar cannot advance her claim past summary judgment. This is true regardless of how Vonderhaar ultimately intended to prove AT&T's retaliatory intent. *See, e.g.*, *Brister v. Mich. Bell Tel. Co.*, 705 F. App'x 356, 359 (6th Cir. 2017) ("[E]stablishing that [they were] constructively discharged" is a "fundamental" "burden that [the employee] must meet regardless of whether we determine that she has presented direct evidence or whether we decide that she must proceed under the *McDonnell Douglas* framework.").

In support of her constructive-discharge claim, Vonderhaar argues that several factors on which we generally rely in considering whether an employee's working conditions were "objectively intolerable" support her case. *See* Appellant's Br. at 41 (contending that, in the immediate run-up to her resignation, she suffered "a decrease in wage or salary," "a material loss of benefits," and "significantly [diminished] material responsibilities"); *accord, e.g.*, *Logan*, 259 F.3d at 570–71 (constructive discharge supported by evidence that, immediately prior to restaurant server's resignation, restaurant demoted her to "busboy," with lower pay and more "menial" responsibilities). But the evidence Vonderhaar cites in support of this proposition, *see* Appellant's Br. at 36, proves only that Vonderhaar lost wages and commissions while she was out on the

---

[10]Notably, on appeal, Vonderhaar has not rooted her retaliation claim in anything other than constructive discharge. As a result, to the extent Vonderhaar could state a retaliation claim based on *just* the forced leave of absence—which arguably constituted an independent adverse employment action (because Vonderhaar lost money as a result of the leave)—that claim is forfeited. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 396–97 (6th Cir. 2016) (noting that a party forfeits an issue when they "ma[k]e no effort" to argue the issue on appeal).

allegedly forced leave of absence. It does not suggest that Vonderhaar suffered a permanent loss in income or diminution in job responsibilities after she returned from that leave of absence, in the two weeks leading up to her resignation. Indeed, Vonderhaar conceded as much at her deposition. *See supra* at 8–9.

With Vonderhaar's assertion of a "material change in salary and job responsibilities" eliminated from consideration, then, it becomes clear that Vonderhaar's evidence of "objectively intolerable" working conditions rests entirely on four allegations: (1) Hoskins and Waymire telling Vonderhaar at the April 17 meeting that she was "too hormonal" and "too emotional" to do her job, (2) Hoskins failing to provide Vonderhaar with coaching sessions (after she returned from leave), (3) Waymire twice giving Vonderhaar the cold shoulder (after she returned from leave), and (4) Hoskins once failing to protect Vonderhaar from a verbally irate customer (after she returned from leave).

These events were undoubtedly frustrating to live through. But, unfortunately for Vonderhaar, even viewed cumulatively, and in the light most favorable to her, these four allegations are the exact kind of one-off, "hurt feelings" incidents that fail to create a triable dispute as to the intolerability of an employee's working conditions. *See, e.g.*, *Groening*, 884 F.3d at 630–31 (negative comments about employee's repeated use of FMLA leave time did "not amount to constructive discharge" because criticism was "limited to a few isolated incidents"); *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012) (similar). Indeed, this court has affirmed findings of no constructive discharge when an employee alleged working conditions far more intolerable than those alleged here. *See, e.g.*, *Brister*, 705 F. App'x at 360 (no constructive discharge despite allegations that supervisor repeatedly made employee cry, "call[ed] her stupid

20

during their daily coaching sessions," and told her "she needed to seek psychological help"). More still, Vonderhaar resigned her post only two weeks after she returned from leave. This short gap in time strongly undercuts Vonderhaar's assertion that any reasonable employee would have resigned under the circumstances. *Cf. id.* (fact that demeaning treatment lasted "only" three to four months suggested reasonable employee would not have felt compelled to resign). The district court was correct to grant summary judgment on this basis.

## C. Wrongful Discharge

Vonderhaar's next claim—wrongful discharge—is rooted in Kentucky state law, and so we look to the decisions of the Kentucky Supreme Court to the extent "that court has addressed the relevant issue." *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009) (quoting *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000)). To the extent the Kentucky Supreme Court has not addressed the relevant issue, however, we must attempt to "anticipate how [that court] would rule in [this] case," and may consider on-point Kentucky Court of Appeals decisions in so doing. *Id*. (quoting *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005)).

The Kentucky Supreme Court has described "[t]he tort of wrongful discharge" as a "carefully crafted exception[] to the common law doctrine that 'an employer may discharge his at-will employee for good cause, no cause, or for a cause that some might view as morally indefensible.'" *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). And, in keeping with the "carefully crafted" nature of the exception, the Kentucky Supreme Court has specifically limited the tort's applicability to the following three situations: "(1) when there are 'explicit legislative

statements prohibiting the discharge,' (2) when '*the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment*,' or (3) when 'the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment.'" *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019) (alteration in original) (emphasis added) (quoting *Hill*, 327 S.W.3d at 422).

This case concerns the second situation—the prohibition on discharging an employee for "failure or refusal to a violate a law in the course of employment." There is no Kentucky Supreme Court decision directly addressing this prohibition, unfortunately. That court has, however, favorably cited a Kentucky Court of Appeals decision, *Northeast Health Management, Inc. v. Cotton*, 56 S.W.3d 440 (Ky. Ct. App. 2001), as a paradigmatic example of this kind of wrongful discharge. *See Hill*, 327 S.W.3d at 422. And, in that case (*Cotton*), the Kentucky Court of Appeals held that a hospital committed wrongful discharge when it created "intolerable working conditions" (and thus "constructively discharged" an employee) because the employee refused to "backdate a business record" "in order for the hospital to maintain its license and . . . be paid through Medicare and Medicaid." *Cotton*, 56 S.W.3d at 445–48 (affirming jury verdict for employee).

Notably, too, we have built upon the Kentucky Supreme Court's general language and cases like *Cotton*, holding that, if presented with the question, the Kentucky Supreme Court would likely rule that the prohibition on firing an employee for "refusing to violate the law" applies not just "when an employer affirmatively requests that the employee violate the law" (as in *Cotton*), but also "when an employee learns of illegal activity, and, although not directly invited to participate by [their] employer, knows [they] will inevitably become complicit in the illegality by

22

performing [their] normal work responsibilities." *Alexander v. Eagle Mfg. Co.*, 714 F. App'x 504, 509 (6th Cir. 2017). This was so, we held, because the "policy behind [the 'refusing to violate the law'] exception is to prevent an employee from having to choose between losing [their] job and breaking the law," and because the Kentucky Supreme Court would "[p]resumably" want to further that policy by protecting employees from employers who are wrong-headed enough to place their employees in a position where they will "inevitably" break the law but savvy enough not to command directly that they do so. *Id.*; *see also Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 108 (6th Cir. 2018) (concurring with *Alexander*'s interpretation of Kentucky law).

Here, Vonderhaar leans heavily on *Alexander* and essentially contends that, although nobody at AT&T asked her to break any laws, she was forced to resign because, had she remained at the Maysville store any longer than she did, she would have "become complicit in [her colleagues'] illegal activity." Appellant's Br. at 46. Accordingly, Vonderhaar concludes, a reasonable juror could find that her resignation constituted a "constructive discharge" in violation of Kentucky law.

In our view, however, AT&T is entitled to summary judgment on this claim. There are at least two reasons for this.

First, outside conclusory allegations in her complaint, *see, e.g.*, R.1.1 (Compl. ¶ 45) (Page ID #14), and generic assertions of "fraud" at her deposition, Vonderhaar has not submitted evidence that her colleagues violated *the law* (as opposed to *company policy*) when they did things like "add temporary phone numbers to boost sales numbers" or "complete a two-year contract with

23

a customer over the phone."[11] This evidentiary shortcoming matters because, without evidence concerning the specific laws at issue, a jury could not find that Vonderhaar risked engaging in *illegal* behavior by continuing to work at the Maysville store. *See, e.g.*, *Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 802–03 (W.D. Ky. 2011) (granting employer summary judgment because, although the employee "may have believed that Defendants' actions were violations of Kentucky law, . . . his subjective belief does not determine whether an action is one that is violative of public policy"; rather, the employee "must put forth evidence that the Defendants['] actions were in fact violations of Kentucky law"); *cf. Cotton*, 56 S.W.3d at 447–48 (jury determined that employee was constructively discharged for "refusing to violate the law" by looking to elements of specific Kentucky statute that employee allegedly risked violating).

Second, even assuming Vonderhaar's colleagues engaged in "fraud" (or other illegal activity), Vonderhaar has submitted no evidence that she would have "inevitably become complicit in the illegality [of her colleagues' acts] by performing [her] normal work responsibilities." *Alexander*, 714 F. App'x at 509.[12] The allegations at issue in *Alexander* are instructive. There, a manufacturing plant employee discovered that his colleagues were removing the "defective" label from car engine blocks, and instead "misrepresenting [them] as good engine blocks." *Id*. at 506. When the employee—who was purportedly "responsible for a final compliance check to ensure that no defective engine blocks were shipped to the automobile manufacturer"—complained about

---

[11]To be sure, Vonderhaar's testimony that her colleagues added insurance to customer accounts without telling the customer *could* constitute evidence that her colleagues violated Kentucky consumer protection law. *See, e.g.*, Ky. Rev. Stat. Ann. § 367.170 (prohibiting "[u]nfair, false, misleading, or deceptive" trade practices). But Vonderhaar did not even attempt to make that showing in her summary-judgment papers or before this court.

[12]Although *Alexander*'s interpretation of Kentucky law does not bind this panel, the decision's reasoning is persuasive; we see no reason to deviate from it here. *Cf. Smith*, 727 F. App'x at 108 ("We agree with the analysis in *Alexander*.").

24

this conduct, the employee's supervisor allegedly told the employee *he* would sign off on the engine blocks if the employee would not. *Id.* The plant then fired the employee the next day, without explanation. This unsettling series of events prompted the employee to file a wrongful discharge suit, under the "refusing to violate a law" provision at issue here. Despite recognizing the more generous interpretation of wrongful-discharge law noted above, we ultimately found (over one judge's dissent) that the employee's complaint failed to state a plausible claim for relief. This was so, we ruled, because (1) in light of the supervisor's comment, there was no reason to assume "that had [the employee] not spoken up, he would have *necessarily* become a forced participant in the allegedly unlawful activity he witnessed," and (2) there was no indication in the complaint "that the activity [the employee] observed was anything more than an isolated incident." *Id.* at 509 (emphasis added).

This case is far easier than *Alexander*. For one, *Alexander* centered around an actual discharge and a (seemingly) straightforward causal connection between the discharge and the employee's refusal to engage in illegal conduct. Neither of those elements is present here. More still, even assuming that Vonderhaar regularly witnessed her colleagues engage in illegal activity, Vonderhaar conceded at her deposition that not only was she was not asked to participate in any of the "illegal activities" she witnessed, either by her supervisors or her colleagues, but she did not actually engage in any of those activities herself, outside a tangential connection to the Jamie Davis "promotional tablet" incident. *See, e.g.*, R.38-5 (Vonderhaar Dep. at 79) (Page ID #482) ("**Q:** Were you ever asked during the time you worked there to engage in this type of similar behavior Ms. Davis did? **A:** Me personally, no, not that I can recall. **Q:** Do you recall engaging on your own in this type of behavior? **A:** Pulling up accounts and adding – no, no, ma'am."). On these

facts, no reasonable juror could find that, had Vonderhaar stayed with AT&T any longer than she did, she "would have necessarily become a forced participant in the allegedly unlawful activity [she] witnessed." *Alexander*, 714 F. App'x at 509.

What's more, unlike *Smith*—where we held that an employee *did* state a plausible wrongful-discharge claim, at least at the motion-to-dismiss stage—Vonderhaar did not work in a supervisory position that would have "inevitably [led] to [her] authorizing [the] fraudulent" transactions she witnessed. *Smith*, 727 F. App'x at 103, 108. Rather, Vonderhaar worked as a floor-level salesperson, and was not directly responsible for anybody else's work. *Cf. id.* (director of nursing at home healthcare provider alleged constructive discharge after discovering, and then reporting, widespread insurance fraud among both staff and upper management).

All told, even under the generous interpretation of Kentucky wrongful-discharge law set forth in *Alexander* (and repeated in *Smith*), Vonderhaar has not shown that a genuine dispute of material fact exists as to whether AT&T constructively discharged her because she "fail[ed] or refus[ed] to violate a law in the course of [her] employment." *Marshall*, 575 S.W.3d at 652 (quoting *Hill*, 327 S.W.3d at 422).

## D. Additional State Law Claims

Finally, as for Vonderhaar's claims of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"), we see no reason to consider them on the merits. Vonderhaar did not address either claim in her briefing, outside a few perfunctory sentences, and has accordingly forfeited any contention that the district court erred when it granted AT&T summary judgment. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 396–97 (6th Cir. 2016) (noting that a party forfeits an issue when they "ma[k]e no effort" to argue the issue on appeal).

This forfeiture is particularly notable because, in ruling for AT&T, the district court did not simply rest its holding on "the same" factual and legal findings it applied to Vonderhaar's FMLA and wrongful-discharge claims, as Vonderhaar seems to contend. Appellant's Br. at 48. Rather, the court's holding rested, at least in part, on the specific element of "emotional injury," which was not at issue in Vonderhaar's other claims. *See, e.g.*, *Vonderhaar*, 2019 WL 1120117, at *11 ("Vonderhaar's IIED claim *also* fails because she has not shown that her emotional injury qualifies as 'serious' or 'severe.'") (emphasis added).

### III. CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.